**OFFICE OF COMMUNICATION OF the UNITED CHURCH OF CHRIST, Aaron Henry, Robert L. T. Smith and United Church of Christ at Tougaloo, Appellants,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

**Lamar Life Broadcasting Company, Intervenor.**

**No. 19409.**

United States Court of Appeals District of Columbia Circuit.

Argued Dec. 3, 1965.

Decided March 25, 1966.

310, 51 S.Ct. 470, 75 L.Ed. 1054 (1931); Sellers v. United States, 106 U.S.App. D.C. 209, 271 F.2d 475 (1959).

Mr. Orrin G. Judd, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Messrs. Earle K. Moore, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, and Henry F. Lerch, Washington, D. C., and Mrs. Ann Aldrich were on the brief, for appellants.

Mr. John H. Conlin, Associate Gen. Counsel, F. C. C., with whom Messrs. Henry Geller, Gen. Counsel, and Howard Jay Braun, Counsel, F. C. C., were on the brief, for appellee.

Mr. Paul A. Porter, Washington, D. C., with whom Messrs. Reed Miller and Jamie Hunter, Washington, D. C., were on the brief, for intervenor.

Mr. Lawrence Speiser, Washington, D. C., filed a brief on behalf of American
Civil Liberties Union, as amicus curiæ, urging reversal.

Before BURGER, McGOWAN and TAMM, Circuit Judges.

BURGER, Circuit Judge:

This is an appeal from a decision of the Federal Communications Commission granting to the Intervenor a one-year renewal of its license to operate television station WLBT in Jackson, Mississippi. Appellants filed with the Commission a timely petition to intervene to present evidence and arguments opposing the renewal application. The Commission dismissed Appellants' petition and, without a hearing, took the unusual step of granting a restricted and conditional renewal of the license. Instead of granting the usual three-year renewal, it limited the license to one year from June 1, 1965, and imposed what it characterizes here as "strict conditions" on WLBT's operations in that one-year probationary period.

The questions presented are (a) whether Appellants, or any of them, have standing before the Federal Communications Commission as parties in interest under Section 309(d) of the Federal Communications Act[1] to contest the renewal of a broadcast license; and (b) whether the Commission was required by Section 309 (e)[2] to conduct an evidentiary hearing on the claims of the Appellants prior to acting on renewal of the license.

Because the question whether representatives of the listening public have standing to intervene in a license renewal proceeding is one of first impression, we have given particularly close attention to the background of these issues and to the Commission's reasons for denying standing to Appellants.

*Background*

The complaints against Intervenor embrace charges of discrimination on racial

1. 74 Stat. 890 (1960), 47 U.S.C. § 309(d) (1964).

2. 78 Stat. 193 (1964), 47 U.S.C. § 309(e) (1964).

and religious grounds and of excessive commercials. As the Commission's order indicates, the first complaints go back to 1955 when it was claimed that WLBT had deliberately cut off a network program about race relations problems on which the General Counsel of the NAACP was appearing and had flashed on the viewers' screens a "Sorry, Cable Trouble" sign. In 1957 another complaint was made to the Commission that WLBT had presented a program urging the maintenance of racial segregation and had refused requests for time to present the opposing viewpoint. Since then numerous other complaints have been made.

When WLBT sought a renewal of its license in 1958, the Commission at first deferred action because of complaints of this character but eventually granted the usual three-year renewal because it found that, while there had been failures to comply with the Fairness Doctrine, the failures were isolated instances of improper behavior and did not warrant denial of WLBT's renewal application.

Shortly after the outbreak of prolonged civil disturbances centering in large part around the University of Mississippi in September 1962, the Commission again received complaints that various Mississippi radio and television stations, including WLBT, had presented programs concerning racial integration in which only one viewpoint was aired. In 1963 the Commission investigated and requested the stations to submit detailed factual reports on their programs dealing with racial issues. On March 3, 1964, while the Commission was considering WLBT's responses, WLBT filed the license renewal application presently under review.

To block license renewal, Appellants filed a petition in the Commission urging denial of WLBT's application and asking to intervene in their own behalf and as representatives of "all other television viewers in the State of Mississippi." The petition[3] stated that the Office of Communication of the United Church of Christ is an instrumentality of the United Church of Christ, a national denomination with substantial membership within WLBT's prime service area. It listed Appellants Henry and Smith as individual residents of Mississippi, and asserted that both owned television sets and that one lived within the prime service area of WLBT; both are described as leaders in Mississippi civic and civil rights groups. Dr. Henry is president of the Mississippi NAACP; both have been politically active. Each has had a number of controversies with WLBT over allotment of time to present views in opposition to those expressed by WLBT editorials and programs. Appellant United Church of Christ at Tougaloo is a congregation of the United Church of Christ within WLBT's area.

The petition claimed that WLBT failed to serve the general public because it provided a disproportionate amount of commercials and entertainment and did not give a fair and balanced presentation of controversial issues, especially those concerning Negroes, who comprise almost forty-five per cent of the total population within its prime service area;[4] it also claimed discrimination against local activities of the Catholic Church.

Appellants claim standing before the Commission on the grounds that:

(1) They are individuals and organizations who were denied a reasonable opportunity to answer their critics, a violation of the Fairness Doctrine.

(2) These individuals and organizations represent the nearly one half of WLBT's potential listening audience who were denied an opportunity to have their

3. By "petition," we refer to both the original petition and the reply to WLBT's opposition to the initial petition.

4. The specific complaints of discrimination were that Negro individuals and institutions are given very much less television exposure than others are given and that programs are generally disrespectful toward Negroes. The allegations were particularized and accompanied by a detailed presentation of the results of Appellants' monitoring of a typical week's programming.

side of controversial issues presented, equally a violation of the Fairness Doctrine, and who were more generally ignored and discriminated against in WLBT's programs.

(3) These individuals and organizations represent the total audience, not merely one part of it, and they assert the right of all listeners, regardless of race or religion, to hear and see balanced programming on significant public questions as required by the Fairness Doctrine [5] and also their broad interest that the station be operated in the public interest in all respects.

The Commission denied the petition to intervene on the ground that standing is predicated upon the invasion of a legally protected interest or an injury which is direct and substantial and that "petitioners * * * can assert no greater interest or claim of injury than members of the general public." The Commission stated in its denial, however, that as a general practice it "does consider the contentions advanced in circumstances such as these, irrespective of any questions of standing or related matters," and argues that it did so in this proceeding.

Upon considering Petitioners' claims and WLBT's answers to them on this basis, the Commission concluded that

> serious issues are presented whether the licensee's operations have fully met the public interest standard. Indeed, it is a close question whether to designate for hearing these applications for renewal of license.

Nevertheless, the Commission conducted no hearing but granted a license renewal, asserting a belief that renewal would be in the public interest since broadcast stations were in a position to make worthwhile contributions to the resolution of pressing racial problems, this contribution was "needed immediately" in the Jackson area, and WLBT, if operated properly,[6] could make such a contribution. Indeed the renewal period was explicitly made a test of WLBT's qualifications in this respect.

> We are granting a renewal of license, so that the licensee can demonstrate and carry out its stated willingness to serve fully and fairly the needs and interests of its entire area—so that it can, in short, meet and resolve the questions raised.

The one-year renewal was on conditions which plainly put WLBT on notice that the renewal was in the nature of a probationary grant; the conditions were stated as follows:

(a) "That the licensee comply strictly with the established requirements of the fairness doctrine."

(b) " * * * [T]hat the licensee observe strictly its representations to the Commission in this [fairness] area * * *."

(c) "That, in the light of the substantial questions raised by the United Church petition, the licensee immediately have discussions with community leaders, including those active in the civil rights movement (such as petitioners), as to whether its programming is fully meeting the needs and interests of its area."

(d) "That the licensee immediately cease discriminatory programming patterns."

(e) That "the licensee will be required

---

5. In promulgating the Fairness Doctrine in 1949 the Commission emphasized the "right of the public to be informed, rather than any right on the part of the Government, any broadcast licensee or any individual member of the public to broadcast his own particular views on any matter * * *." The Commission characterized this as "the foundation stone of the American system of broadcasting." *Editorializing by Broadcast Licensees*, 13 F.C.C. 1246, 1249 (1949). This policy received Congressional approval in the 1959 amendment of Section 315 which speaks in terms of "the obligation imposed upon [licensees] under this Act to operate in the public interest and to afford reasonable opportunity for the discussion of conflicting views on issues of public importance." 73 Stat. 557 (1959), 47 U.S.C. § 315(a) (1964).

6. " * * * we cannot stress too strongly that the licensee must operate in complete conformity with its representations and the conditions laid down."

to make a detailed report as to its efforts in the above four respects * * *."

Appellants contend that, against the background of complaints since 1955 and the Commission's conclusion that WLBT was in fact guilty of "discriminatory programming," the Commission could not properly renew the license even for one year without a hearing to resolve factual issues raised by their petition and vitally important to the public. The Commission argues, however, that it in effect accepted Petitioners' view of the facts, took all necessary steps to insure that the practices complained of would cease, and for this reason granted a short-term renewal as an exercise by the Commission of what it describes as a " 'political' decision, 'in the higher sense of that abused term,' which is peculiarly entrusted to the agency."[7] The Commission seems to have based its "political decision" on a blend of what the Appellants alleged, what its own investigation revealed, its hope that WLBT would improve, and its view that the station was needed.

*Standing of Appellants* [8]

The Commission's denial of standing to Appellants was based on the theory that, absent a potential direct, substantial injury or adverse effect from the administrative action under consideration, a petitioner has no standing before the Commission and that the only types of effects sufficient to support standing are economic injury and electrical interference. It asserted its traditional position that members of the listening public do not suffer any injury peculiar to them and that allowing them standing would pose great administrative burdens.[9]

Up to this time, the courts have granted standing to intervene only to those alleging electrical interference, NBC v. FCC (KOA), 76 U.S.App.D.C. 238, 132 F.2d 545 (1942), aff'd, 319 U.S. 239, 63 S.Ct. 1035, 87 L.Ed. 1374 (1943), or alleging some economic injury, e. g., FCC v. Sanders Bros. Radio Station, 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869 (1940). It is interesting to note, however, that the Commission's traditionally narrow view of standing initially led it to deny standing to the very categories it now asserts are the only ones entitled thereto. In *Sanders* the Commission argued that economic injury was not a basis for standing,[10] and in *KOA* that electrical interference was insufficient. This history indicates that neither administrative nor judicial concepts of standing have been static.

What the Commission apparently fails to see in the present case is that the courts have resolved questions of standing as they arose and have at no time manifested an intent to make economic interest and electrical interference the

7. Intervenor and the Commission depart from the record to argue that WLBT has fully complied with the conditions and that the Commission's hope that WLBT would make a valuable contribution to the problems of race relations is being fulfilled. Appellants respond that WLBT has not adequately corrected unbalanced programming. We do not consider these claims as to the alleged success of the Commission's effort to permit WLBT to purge itself of misconduct relevant either to the question of standing or to the correctness of the grant of a renewal without a hearing. We confine ourselves to the record as made before the Commission.

8. All parties seem to consider that the same standards are applicable to determining standing before the Commission and standing to appeal a Commission order to this court. See Philco Corp. v. FCC, 103 U.S.App.D.C. 278, 257 F.2d 656 (1958), cert. denied, 358 U.S. 946, 79 S.Ct. 350, 3 L.Ed.2d 352 (1959); Metropolitan Television Co. v. FCC, 95 U.S.App.D.C. 326, 221 F.2d 879 (1955). We have, therefore, used the cases dealing with standing in the two tribunals interchangeably.

9. See Northern Pacific Radio Corp., 23 P & F Rad.Reg. 186 (1962); Gordon Broadcasting of San Francisco, Inc., 22 P & F Rad.Reg. 236 (1962).

10. It argued that, since economic injury was not a ground for refusing a license, it could not be a basis of standing. See generally Chicago Junction Case, 264 U.S. 258, 44 S.Ct. 317, 68 L.Ed. 667 (1924).

exclusive grounds for standing. *Sanders,* for instance, granted standing to those economically injured on the theory that such persons might well be the only ones sufficiently interested to contest a Commission action. 309 U.S. 470, 477, 60 S.Ct. 693. In *KOA* we noted the anomalous result that, if standing were restricted to those with an economic interest, educational and non-profit radio stations, a prime source of public-interest broadcasting, would be defaulted. Because such a rule would hardly promote the statutory goal of public-interest broadcasting, we concluded that non-profit stations must be heard without a showing of economic injury and held that all broadcast licensees could have standing by showing injury other than financial (there, electrical interference). Our statement that *Sanders* did not limit standing to those suffering direct economic injury was not disturbed by the Supreme Court when it affirmed *KOA.* 319 U.S. 239, 63 S.Ct. 1035 (1943).

It is important to remember that the cases allowing standing to those falling within either of the two established categories have emphasized that standing is accorded to persons not for the protection of their private interest but only to vindicate the public interest.

"The Communications Act of 1934 did not create new private rights. The purpose of the Act was to protect the public interest in communications. By § 402(b) (2), Congress gave the right of appeal to persons 'aggrieved or whose interests are adversely affected' by Commission action. * * * But *these private litigants have standing only as representatives of the public interest.* Federal Communications Commission v. Sanders Radio Station, 309 U.S. 470, 477, 642, 60 S.Ct. 693, 698, 84 L.Ed. 869, 1037." Associated Industries of New York State, Inc. v.

Ickes, 134 F.2d 694, 703 (2d Cir. 1943), vacated as moot, 320 U.S. 707, 64 S.Ct. 74, 88 L.Ed. 414 (1943), quoting Scripps-Howard Radio, Inc. v. FCC, 316 U.S. 4, 14, 62 S.Ct. 875, 86 L.Ed. 1229 (1942).

On the other hand, some Congressional reports have expressed apprehensions, possibly representing the views of both administrative agencies and broadcasters, that standing should not be accorded lightly so as to make possible intervention into proceedings "by a host of parties who have no legitimate interest but solely with the purpose of delaying license grants which properly should be made." [11] But the recurring theme in the legislative reports is not so much fear of a plethora of parties in interest as apprehension that standing might be abused by persons with no *legitimate* interest in the proceedings but with a desire only to delay the granting of a license for some private selfish reason.[12] The Congressional Committee which voiced the apprehension of a "host of parties" seemingly was willing to allow standing to anyone who could show economic injury or electrical interference. Yet these criteria are no guarantee of the legitimacy of the claim sought to be advanced, for, as another Congressional Committee later lamented, "In many of these cases the protests are based on grounds which have little or no relationship to the public interest."[13]

We see no reason to believe, therefore, that Congress through its committees had any thought that electrical interference and economic injury were to be the exclusive grounds for standing or that it intended to limit participation of the listening public to writing letters to the Complaints Division of the Commission. Instead, the Congressional re-

11. S.Rep.No. 44, 82d Cong., 1st Sess. 8 (1951).

12. See, *e. g., ibid.*; S.Rep.No. 1231, 84th Cong., 1st Sess. 1–3 (1955); H.R.Rep. No. 1051, 84th Cong., 1st Sess. 2–3 (1955); H.R.Rep.No. 1800, 86th Cong., 2d Sess. 9–10, U.S.Code Cong. & Admin. News 1960, p. 3516 (1960).

13. H.R.Rep.No. 1051, 84th Cong., 1st Sess. 3 (1955).

ports seem to recognize that the issue of standing was to be left to the courts.[14]

■ The Commission's rigid adherence to a requirement of direct economic injury in the commercial sense operates to give standing to an electronics manufacturer who competes with the owner of a radio-television station only in the sale of appliances,[15] while it denies standing to spokesmen for the listeners, who are most directly concerned with and intimately affected by the performance of a licensee. Since the concept of standing is a practical and functional one designed to insure that only those with a genuine and legitimate interest can participate in a proceeding, we can see no reason to exclude those with such an obvious and acute concern as the listening audience. This much seems essential to insure that the holders of broadcasting licenses be responsive to the needs of the audience, without which the broadcaster could not exist.

There is nothing unusual or novel in granting the consuming public standing to challenge administrative actions. In Associated Industries of New York State, Inc. v. Ickes, 134 F.2d 694 (2d Cir.1943), vacated as moot, 320 U.S. 707, 64 S.Ct. 74, 88 L.Ed. 414 (1943), coal consumers were found to have standing to review a minimum price order. In United States v. Public Utilities Commission, 80 U.S.App.D.C. 227, 151 F.2d 609 (1945), we held that a consumer of electricity was affected by the rates charged and could appeal an order setting them. Similarly in Bebchick v. Public Utilities Commission, 109 U.S.App.D.C. 298, 287 F.2d 337 (1961), we had no difficulty in concluding that a public transit rider had standing to appeal a rate increase. A direct economic injury, even if small as to each user, is involved in the rate cases, but standing has also been granted to a passenger to contest the legality of Interstate Commerce Commission rules allowing racial segregation in railroad dining cars. Henderson v. United States, 339 U.S. 816, 70 S.Ct. 843, 94 L.Ed. 1302 (1950). Moreover, in Reade v. Ewing, 205 F.2d 630 (2d Cir. 1953), a consumer of oleomargarine was held to have standing to challenge orders affecting the ingredients thereof.[16]

These "consumer" cases were not decided under the Federal Communications Act, but all of them have in common with the case under review the interpretation of language granting standing to persons "affected" or "aggrieved". The Commission fails to suggest how we are to distinguish these cases from those involving standing of broadcast "consumers" to oppose license renewals in the Federal Communications Commission. The total number of potential individual suitors who are consumers of oleomargarine or public transit passengers would seem to be greater than the number of responsible representatives of the listening public who are potential intervenors in a proceeding affecting a single broadcast reception area. Furthermore, assuming we look only to the commercial economic aspects and ignore vital public interest, we cannot believe that the economic stake of the consumers of electricity or public transit riders is more significant than that of listeners who collectively have a huge aggregate investment in receiving equipment.[17]

---

14. Perhaps the mention in these reports of economic and electrical injury arose out of preoccupation with problems surrounding initial licensing procedures, as distinguished from those involved in renewal proceedings. See p. 1004, infra.

15. Philco Corp. v. FCC, 103 U.S.App. D.C. 278, 257 F.2d 656 (1958), cert. denied, 358 U.S. 946, 79 S.Ct. 350, 3 L.Ed. 2d 35 (1959).

16. In the most recent case on the subject, the Second Circuit, relying on cases under the Federal Communications Act, held that non-profit conservation associations have standing to protect the aesthetic, conservational, and recreational aspects of power development. Scenic Hudson Preservation Conference v. FPC, 354 F.2d 608 (2d Cir. 1965).

17. According to Robert Sarnoff of NBC the total investment in television by American viewers is 40 billion dollars, a figure perhaps twenty times as large as

■ The argument that a broadcaster is not a public utility is beside the point. True it is not a public utility in the same sense as strictly regulated common carriers or purveyors of power, but neither is it a purely private enterprise like a newspaper or an automobile agency. A broadcaster has much in common with a newspaper publisher, but he is not in the same category in terms of public obligations imposed by law. A broadcaster seeks and is granted the free and exclusive use of a limited and valuable part of the public domain; when he accepts that franchise it is burdened by enforceable public obligations. A newspaper can be operated at the whim or caprice of its owners; a broadcast station cannot. After nearly five decades of operation the broadcast industry does not seem to have grasped the simple fact that a broadcast license is a public trust subject to termination for breach of duty.

■ Nor does the fact that the Commission itself is directed by Congress to protect the public interest constitute adequate reason to preclude the listening public from assisting in that task. *Cf.* UAW v. Scofield, 382 U.S. 205, 86 S.Ct. 335, 15 L.Ed.2d 304 (1965). The Commission of course represents and indeed is the prime arbiter of the public interest, but its duties and jurisdiction are vast, and it acknowledges that it cannot begin to monitor or oversee the performance of every one of thousands of licensees. Moreover, the Commission has always viewed its regulatory duties as guided if not limited by our national tradition that public response is the most reliable test of ideas and performance in broadcasting as in most areas of life. The Commission view is that we have traditionally depended on this public reaction rather than on some form of governmental supervision or "censorship" mechanisms.

[I]t is the public in individual communities throughout the length and breadth of our country who must bear final responsibility for the quality and adequacy of television service—whether it be originated by local stations or by national networks. Under our system, the interests of the public are dominant. The commercial needs of licensed broadcasters and advertisers must be integrated into those of the public. *Hence, individual citizens and the communities they compose owe a duty to themselves and their peers to take an active interest in the scope and quality of the television service* which stations and networks provide and which, undoubtedly, has a *vast impact on their lives and the lives of their children.* Nor need the public feel that in taking a hand in broadcasting they are unduly interfering in the private business affairs of others. On the contrary, *their interest in television programming is direct* and their responsibilities important. *They are the owners* of the channels of television—indeed, of all broadcasting.

FCC, *Television Network Program Procurement,* H.R.Rep. No. 281, 88th Cong., 1st Sess. 20 (1963). (Emphasis added.)

Taking advantage of this "active interest in the * * * quality" of broadcasting rather than depending on governmental initiative is also desirable in that it tends to cast governmental power, at least in the first instance, in the more detached role of arbiter rather than accuser.

The theory that the Commission can always effectively represent the listener interests in a renewal proceeding without the aid and participation of legitimate listener representatives fulfilling the role of private attorneys general is one of those assumptions we collectively try to work with so long as they are reasonably adequate. When it becomes clear, as it does to us now, that it is no longer a valid assumption which stands

---

the total investment of broadcasters. FCC, *Television Network Program Procurement,* H.R.Rep.No. 281, 88th Cong., 1st Sess. 57 (1963). Forty billion dollars would seem to afford at least one substantial brick in a foundation for standing.

up under the realities of actual experience, neither we nor the Commission can continue to rely on it. The gradual expansion and evolution of concepts of standing in administrative law attests that experience rather than logic or fixed rules has been accepted as the guide.

The Commission's attitude in this case is ambivalent in the precise sense of that term. While attracted by the potential contribution of widespread public interest and participation in improving the quality of broadcasting, the Commission rejects effective public participation by invoking the oft-expressed fear that a "host of parties" will descend upon it and render its dockets "clogged" and "unworkable." The Commission resolves this ambivalence for itself by contending that in this renewal proceeding the viewpoint of the public was adequately represented since it fully considered the claims presented by Appellants even though denying them standing. It also points to the general procedures for public participation that are already available, such as the filing of complaints with the Commission,[18] the practice of having local hearings,[19] and the ability of people who are not parties in interest to appear at hearings as witnesses.[20] In light of the Commission's procedure in this case and its stated willingness to hear witnesses having complaints, it is difficult to see how a grant of formal standing would pose undue or insoluble problems for the Commission.

██ We cannot believe that the Congressional mandate of public participation which the Commission says it seeks to fulfill[21] was meant to be limited to writing letters to the Commission, to inspection of records, to the Commission's grace in considering listener claims, or to mere non-participating appearance at hearings. We cannot fail to note that the long history of complaints against WLBT beginning in 1955 had left the Commission virtually unmoved in the subsequent renewal proceedings, and it seems not unlikely that the 1964 renewal application might well have been routinely granted except for the determined and sustained efforts of Appellants at no small expense to themselves.[22] Such beneficial contribution as these Appellants, or some of them, can make must not be left to the grace of the Commission.

Public participation is especially important in a renewal proceeding, since the public will have been exposed for at least three years to the licensee's performance, as cannot be the case when the Commission considers an initial grant, unless the applicant has a prior record as a licensee. In a renewal proceeding, furthermore, public spokesmen, such as Appellants here, may be the only objectors. In a community served by only one outlet, the public interest focus is perhaps sharper and the need for airing complaints often greater than where, for example, several channels exist. Yet if there is only one outlet, there are no rivals at hand to assert the public interest, and reliance on opposing applicants to challenge the existing licensee for the channel would be fortuitous at best. Even when there are multiple competing stations in a locality, various factors may operate to inhibit the other broadcasters from opposing a renewal application. An imperfect rival may be thought a desirable rival, or there may be a "gentleman's agreement" of deference to a fellow broacaster in the hope he will reciprocate on a propitious occasion.

Thus we are brought around by analogy to the Supreme Court's reasoning in *Sanders;* unless the listeners—the broadcast consumers—can be heard, there may

18. 47 C.F.R. § 1.587 (1965).

19. 74 Stat. 892 (1960), 47 U.S.C. § 311 (1964).

20. 47 C.F.R. § 1.225 (1965).

21. See 30 Fed.Reg. 4543 (1965).

22. We recognize, of course, the existence of strong tides of public opinion and other forces at work outside the listening area of the Licensee which may not have been without some effect on the Commission.

be no one to bring programming deficiencies or offensive overcommercialization to the attention of the Commission in an effective manner. By process of elimination those "consumers" willing to shoulder the burdensome and costly processes of intervention in a Commission proceeding are likely to be the only ones "having a sufficient interest" to challenge a renewal application. The late Edmond Cahn addressed himself to this problem in its broadest aspects when he said, "Some consumers need bread; others need Shakespeare; others need their rightful place in the national society —what they all need is processors of law who will consider the people's needs more significant than administrative convenience." *Law in the Consumer Perspective*, 112 U.Pa.L.Rev. 1, 13 (1963).

Unless the Commission is to be given staff and resources to perform the enormously complex and prohibitively expensive task of maintaining constant surveillance over every licensee, some mechanism must be developed so that the *legitimate* interests of listeners can be made a part of the record which the Commission evaluates. An initial applicant frequently floods the Commission with testimonials from a host of representative community groups as to the relative merit of their champion, and the Commission places considerable reliance on these vouchers; on a renewal application the "campaign pledges" of applicants must be open to comparison with "performance in office" aided by a limited number of responsible representatives of the listening public when such representatives seek participation.

█ We recognize the risks alluded to by Judge Madden in his cogent dissent in *Philco;*[23] regulatory agencies, the Federal Communications Commission in particular, would ill serve the public interest if the courts imposed such heavy burdens on them as to overtax their capacities. The competing consideration is that experience demonstrates consumers are

generally among the best vindicators of the public interest. In order to safeguard the public interest in broadcasting, therefore, we hold that some "audience participation" must be allowed in license renewal proceedings. We recognize this will create problems for the Commission but it does not necessarily follow that "hosts" of protestors must be granted standing to challenge a renewal application or that the Commission need allow the administrative processes to be obstructed or overwhelmed by captious or purely obstructive protests. The Commission can avoid such results by developing appropriate regulations by statutory rulemaking. Although it denied Appellants standing, it employed *ad hoc* criteria in determining that these Appellants were responsible spokesmen for representative groups having significant roots in the listening community. These criteria can afford a basis for developing formalized standards to regulate and limit public intervention to spokesmen who can be helpful. A petition for such intervention must "contain specific allegations of fact sufficient to show that the petitioner is a party in interest and that a grant of the application would be prima facie inconsistent" with the public interest. 74 Stat. 891 (1960), 47 U.S.C. 309(d) (1) (1964).

The responsible and representative groups eligible to intervene cannot here be enumerated or categorized specifically; such community organizations as civic associations, professional societies, unions, churches, and educational institutions or associations might well be helpful to the Commission. These groups are found in every community; they usually concern themselves with a wide range of community problems and tend to be representatives of broad as distinguished from narrow interests, public as distinguished from private or commercial interests.

█ The Commission should be accorded broad discretion in establishing and applying rules for such public par-

---

23. 103 U.S.App.D.C. at 281, 257 F.2d at 659 (1958), cert. denied, 358 U.S. 946, 79 S.Ct. 350, 3 L.Ed.2d 352 (1959).

ticipation, including rules for determining which community representatives are to be allowed to participate and how many are reasonably required to give the Commission the assistance it needs in vindicating the public interest.[24] The usefulness of any particular petitioner for intervention must be judged in relation to other petitioners and the nature of the claims it asserts as basis for standing. Moreover it is no novelty in the administrative process to require consolidation of petitions and briefs to avoid multiplicity of parties and duplication of effort.

The fears of regulatory agencies that their processes will be inundated by expansion of standing criteria are rarely borne out. Always a restraining factor is the expense of participation in the administrative process, an economic reality which will operate to limit the number of those who will seek participation; legal and related expenses of administrative proceedings are such that even those with large economic interests find the costs burdensome. Moreover, the listening public seeking intervention in a license renewal proceeding cannot attract lawyers to represent their cause by the prospect of lucrative contingent fees, as can be done, for example, in rate cases.

We are aware that there may be efforts to exploit the enlargement of intervention, including spurious petitions from private interests not concerned with the quality of broadcast programming, since such private interests may sometimes cloak themselves with a semblance of public interest advocates. But this problem, as we have noted, can be dealt with by the Commission under its inherent powers and by rulemaking.

 In line with this analysis, we do not now hold that all of the Appellants have standing to challenge WLBT's renewal. We do not reach that question. As to these Appellants we limit ourselves to holding that the Commission must allow standing to one or more of them as responsible representatives to assert and prove the claims they have urged in their petition.

It is difficult to anticipate the range of claims which may be raised or sought to be raised by future petitioners asserting representation of the public interest. It is neither possible nor desirable for us to try to chart the precise scope or patterns for the future. The need sought to be met is to provide a means for reflection of listener appraisal of a licensee's performance as the performance meets or fails to meet the licensee's statutory obligation to operate the facility in the public interest. The matter now before us is one in which the alleged conduct adverse to the public interest rests primarily on claims of racial discrimination, some elements of religious discrimination, oppressive overcommercialization by advertising announcements, and violation of the Fairness Doctrine. Future cases may involve other areas of conduct and programming adverse to the public interest; at this point we can only emphasize that intervention on behalf of the public is not allowed to press private interests but only to vindicate the broad public interest relating to a licensee's performance of the public trust inherent in every license.

### Hearing

 We hold further that in the circumstances shown by this record an evidentiary hearing was required in order

---

24. Professor Jaffe concedes there are strong reasons to reject public or listener standing but he believes "it does have much to commend it" in certain areas if put in terms of "jurisdiction subject to judicial discretion to be exercised with due regard for the character of the interests and the issues involved in each case." Jaffe, *Standing to Secure Judicial Review: Private Actions*, 75 Harv. L.Rev. 255, 282 (1961). "There are

many persons * * * who feel that neither the industry nor the FCC can be trusted to protect the listener interest. If this is so, the public action is appropriate. But a frank recognition that the action is a public action and not a private remedy would allow us to introduce the notion of discretion at both the administrative and judicial levels." *Id.* at 284.

to resolve the public interest issue. Under Section 309(e) the Commission must set a renewal application for hearing where "a substantial and material question of fact is presented *or* the Commission for any reason is unable to make the finding" that the public interest, convenience, and necessity will be served by the license renewal. (Emphasis supplied.)

The Commission argues in this Court that it accepted all Appellants' allegations of WLBT's misconduct and that for this reason no hearing was necessary.[25] Yet the Commission recognized that WLBT's past behavior, as described by Appellants, would preclude the statutory finding of public interest necessary for license renewal;[26] hence its grant of the one-year license on the policy ground that there was an urgent need at the time for a properly run station in Jackson must have been predicated on a belief that the need was so great as to warrant the risk that WLBT might continue its improper conduct.

We agree that a history of programming misconduct of the kind alleged would preclude, as a matter of law, the required finding that renewal of the license would serve the public interest. It is important to bear in mind, moreover, that although in granting an initial license the Commission must of necessity engage in some degree of forecasting future performance, in a renewal proceeding past performance is its best criterion. When past performance is in conflict with the public interest, a very heavy burden rests on the renewal applicant to show how a renewal can be reconciled with the public interest. Like public officials charged with a public trust, a renewal applicant, as we noted in our discussion of standing, must literally "run on his record."

The Commission in effect sought to justify its grant of the one-year license, in the face of accepted facts irreconcilable with a public interest finding, on the ground that as a matter of policy the immediate need warranted the risks involved, and that the "strict conditions" it imposed on the grant would improve *future* operations. However the conditions which the Commission made explicit in the one-year license are implicit in every grant. The Commission's opinion reveals how it labored to justify the result it thought was dictated by the urgency of the situation.[27] The majority

25. The Commission also argues that Appellants do not have standing in this Court as persons aggrieved or adversely affected under 66 Stat. 718 (1952), as amended, 47 U.S.C. § 402(b) (1964), because all their allegations were accepted as true. However, denial of the relief they sought rendered them persons aggrieved.

26. In the 1959 renewal proceedings the Commission conceded that WLBT's misconduct then shown would preclude a grant except that there were only "isolated instances."

27. "24. The discussion in B and C, above, establishes that serious issues are presented whether the licensee's operations have fully met the public interest standard. Indeed, it is a close question whether to designate for hearing these applications for renewal of license. In making its judgment, the Commission has taken into account that this particular area is entering a critical period in race relations, and that the broadcast stations, such as here involved, can make a most worthwhile contribution to the resolution of problems arising in this respect. That contribution is needed now—and should not be put off for the future. We believe that the licensee, operating in strict accordance with the representations made and other conditions specified herein, can make that needed contribution, and thus that its renewal would be in the public interest.

25. But we cannot stress too strongly that the licensee must operate in complete conformity with its representations and the conditions laid down. In the last *two* renewal periods, questions have been raised whether the licensee has complied with the requirements of the fairness doctrine; in the last renewal period, substantial public interest questions have been raised by the petition filed by most responsible community leaders. We are granting a renewal of license, so that the licensee can demonstrate and carry out its stated willingness to serve fully and fairly the needs and interests of its entire area—so that it can, in short, meet

considered the question of setting the application for hearing a "close" one; Chairman Henry and Commissioner Cox would have granted a hearing to Appellants as a matter of right.

The Commission's "policy" decision is not a reflection of some long standing or accepted proposition but represents an *ad hoc* determination in the context of Jackson's contemporary problem. Granted the basis for a Commission "policy" recognizing the value of properly run broadcast facilities to the resolution of community problems, if indeed this truism rises to the level of a policy, it is a determination valid in the abstract but calling for explanation in its application.

■ Assuming *arguendo* that the Commission's acceptance of Appellants' allegations would satisfy one ground for dispensing with a hearing, *i. e.*, absence of a question of fact, Section 309(e) also commands that in order to avoid a hearing the Commission must make an affirmative finding that renewal will serve the public interest. Yet the only finding on this crucial factor is a qualified statement that the public interest would be served, provided WLBT thereafter complied strictly with the specified conditions. Not surprisingly, having asserted that it accepted Petitioners' allegations, the Commission thus considered itself unable to make a categorical determination that on WLBT's record of performance it was an appropriate entity to receive the license. It found only that *if* WLBT changed its ways, something which the Commission did not and, of course, could not guarantee, the licensing would be proper. The statutory public interest finding cannot be inferred from a statement of the obvious truth that a properly operated station will serve the public interest.

We view as particularly significant the Commission's summary:

> and resolve the questions raised. Further, in line with the basic policy determination set out in par. 24, the licensee's efforts in this respect must be made now, and continue throughout the license period."

We are granting a renewal of license, so that the licensee can demonstrate and carry out its stated willingness to serve fully and fairly the needs and interests of its entire area—so that it can, in short, meet and resolve the questions raised.

The only "stated willingness to serve fully and fairly" which we can glean from the record is WLBT's protestation that it had always fully performed its public obligations. As we read it the Commission's statement is a strained and strange substitute for a public interest finding.

■ We recognize that the Commission was confronted with a difficult problem and difficult choices, but it would perhaps not go too far to say it elected to post the Wolf to guard the Sheep in the hope that the Wolf would mend his ways because some protection was needed at once and none but the Wolf was handy. This is not a case, however, where the Wolf had either promised or demonstrated any capacity and willingness to change, for WLBT had stoutly denied Appellants' charges of programming misconduct and violations.[28] In these circumstances a pious hope on the Commission's part for better things from WLBT is not a substitute for evidence and findings. *Cf.* Interstate Broadcasting Co. v. FCC, 116 U.S.App. D.C. 327, 323 F.2d 797 (1963).

Even if the embodiment of the Commission's hope be conceded *arguendo* to be a finding, there was not sufficient evidence in the record to justify a "policy determination" that the need for a properly run station in Jackson was so pressing as to justify the risk that WLBT might well continue with an inadequate performance. The issues which should have been considered could be resolved only in an evidentiary hearing in which all aspects of its qualifications and performance could be explored.

---

28. The Commission should have discretion to experiment and even to take calculated risks on renewals where a licensee confesses the error of its ways; this is not such a case.

It is open to question whether the public interest would not be as well, if not better served with one TV outlet acutely conscious that adherence to the Fairness Doctrine is a *sine qua non* of every licensee. Even putting aside the salutary warning effect of a license denial, there are other reasons why one station in Jackson might be better than two for an interim period. For instance, in a letter to the Commission, Appellant Smith alleged that the other television station in Jackson had agreed to sell him time only if WLBT did so.[29] It is arguable that the pressures on the other station might be reduced if WLBT were in other hands—or off the air. The need which the Commission thought urgent might well be satisfied by refusing to renew the license of WLBT and opening the channel to new applicants under the special temporary authorization procedures available to the Commission on the theory that another, and better suited, operator could be found to broadcast on the channel with brief, if any, interruption of service. The Commission's opinion reflects no consideration of these or other alternatives.

 We hold that the grant of a renewal of WBLT's license for one year was erroneous. The Commission is directed to conduct hearings on WLBT's renewal application, allowing public intervention pursuant to this holding. Since the Commission has already decided that Appellants are responsible representatives of the listening public of the Jackson area, we see no obstacle to a prompt determination granting standing to Appellants or some of them. Whether WLBT should be able to benefit from a showing of good performance, if such is the case, since June 1965 we do not undertake to decide. The Commission has had no occasion to pass on this issue and we therefore refrain from doing so.[30]

The record is remanded to the Commission for further proceedings consistent with this opinion; jurisdiction is retained in this court.

Reversed and remanded.

---

29. Letter to Commission from Rev. Robert L. T. Smith, received Jan. 17, 1962, Record, p. 1.

30. In light of our holding, the special form of license granted here is not unlike a special temporary authorization. Under the Commission's position in Community Broadcasting Co., Inc. v. FCC, 107 U.S. App.D.C. 95, 274 F.2d 753 (1960), it may be that the Commission will conclude that good performance under this conditional or probationary license should not weigh in favor of WLBT.