Marita K. BOYCE

v.

Francis L. RIZZO, Mayor of Philadelphia, Hillel Levinson, Managing Director of Philadelphia, Charles E. Dorfman, Commissioner of Revenue of the City of Philadelphia, Local 1660 of the International Federation of State, County and Municipal Employees, District Council 33 of the International American Federation of State, County and Municipal Employees, Martin Weinberg, Chairman of the Philadelphia Democratic City Committee and Joseph Sullivan, Democratic Leader of the 25th Ward in the City of Philadelphia.

Civ. A. No. 77–1335.

United States District Court,
E. D. Pennsylvania.

May 24, 1978.

Margaret M. Boyce, Mary Ann Hagan, Philadelphia, Pa., for plaintiff.

Gayle R. Smith, Charles O'Connell, III, Asst. City Solicitors, Philadelphia, Pa., for defendants Francis L. Rizzo, Hillel Levinson and Charles E. Dorfman.

Larrick Stapleton, Philadelphia, Pa., for defendant Joseph Sullivan.

Michael T. Leibig, Washington, D. C., for defendants Local 1660, Council 33.

Isadore A. Shrager, Jeffrey B. Albert, Philadelphia, Pa., for defendant Martin Weinberg.

## OPINION

LUONGO, District Judge.

This civil rights suit is related to Civil Action No. 77–3454, *Boyce v. School District of Philadelphia*. In both, plaintiff seeks redress for allegedly unconstitutional dismissal from public employment. Defendants in No. 77–3454 are Philadelphia School District Superintendent Michael P. Marcase and Personnel Director Murray Bookbinder.[1] Defendants in the instant case are three municipal officials, Philadelphia Mayor Frank L. Rizzo,[2] Managing Director Hillel Levinson, and Commissioner of Revenue Charles E. Dorfman; two unions, Local 1660 and District Council 33 of the International Federation of State, County and Municipal Employees; and two local officials of the Democratic Party, City Committee Chairman Martin Weinberg and 25th Ward Leader Joseph Sullivan.

The plaintiff, Marita K. Boyce, alleges[3] that she "was employed as a Clerk I by the School District of Philadelphia in the Philadelphia Department of Collections" until her dismissal in the spring of 1976; that on March 6, 1976, she was informed "that she was being laid off from her job"; that after exhaustion of accumulated vacation pay, she was removed from the School District's payroll on April 13; and that she has never received any official notice from the School District that she was terminated, and all attempts to gain rehire have been spurned, although several other employees who were

---

1. On March 16, 1978, I entered an order dismissing the School District of Philadelphia as a defendant in that action.

2. All of the papers in this case, including those filed by defendants, list the Mayor's name as "Francis L. Rizzo."

3. The allegations are as set forth in plaintiff's amended complaint which was filed by leave of court on November 9, 1977.

laid off with her have since been rehired through the intercession of various political leaders. Plaintiff alleges further that she was discharged because of her political opposition to Mayor Rizzo:

> "19. In subsequent conversation with [union leaders], Plaintiff ascertained that City Officials terminated her because she was anti Rizzo and supported Louis Hill in the 1975 Democratic [Mayoral] Primary and had made slanderous remarks concerning Mayor Rizzo and his administration.

> . . . . .

> 30. After inquiry, Plaintiff has been advised that she was fired for political reasons and that she would not be rehired for the same reasons. Further, she was informed that she was fired because of the political beliefs of certain members of her family, which adversely reflected on her."

The amended complaint characterizes plaintiff's dismissal as "retaliation for her expression of opinion and that of members of her family on matters of public concern." Plaintiff asserts that defendants Rizzo, Levinson, Dorfman, Weinberg, and Sullivan conspired to have her fired and to prevent her from regaining her job.

As to the unions, plaintiff alleges that she is a member of Local 1660, a subsidiary of District Council 33, and that union dues were deducted from her paycheck when she was a School District employee. She asserts that the unions "joined in the conspiracy perpetrated by the other five defendants by failing to represent plaintiff, subsequent to the firing despite her long years of public service and her seniority standing in the job." She complains that the unions did not institute proper grievance procedures and allowed employees with less seniority to be rehired before her.

Plaintiff claims that defendants' conduct violated the Civil Rights Act of 1871, 42 U.S.C. §§ 1983, 1985, 1986.[4] She seeks an injunction compelling reinstatement with back pay and an award of compensatory and punitive damages.

Following the institution of this action, the unions have attempted to side with plaintiff. In June 1977, they filed a motion to be realigned as plaintiffs. In August 1977, plaintiff moved for leave to amend the complaint to accomplish the same realignment. On September 23, 1977, I entered an order denying those motions, primarily because of the patently adversarial positions charged in plaintiff's complaint. Pursuant to Federal Rule of Civil Procedure 13(g), the unions then filed a cross-claim against the other defendants.[5] The cross-claim repeats the essential allegations of plaintiff's complaint and asserts further that

> "[Union] representatives' efforts to achieve a rehire of Boyce were frustrated by claims that the firing was patronage related and, therefore, unavoidable. The existence of the patronage system prevented both [union] organizations from the full representation of Boyce which would have resulted under a non-patronage system."

The cross-claim does not set forth the legal basis upon which the unions are entitled to relief. The request for relief follows the complaint in seeking plaintiff's reinstatement and award of damages, but, in addition, the cross-claimants request the Court to "[p]ermanently restrain the defendants from using the political beliefs and opinions and/or the political associations of members of Local 1660 and/or District Council 33 as a basis for termination from employment."

---

4. Jurisdiction is based on 28 U.S.C. §§ 1343, 1443. Since § 1443 only applies to removal of actions originally instituted in state court, and since this is not such a case, that section does not apply. Section 1343 is a proper basis for jurisdiction, however.

5. Rule 13(g) provides:

"A pleading may state as a cross-claim any claim by one party against a co-party arising out of the transaction or occurrence that is the subject matter either of the original action or of a counter-claim therein or relating to any property that is the subject matter of the original action. Such cross-claim may include a claim that the party against whom it is asserted is or may be liable to the cross-claimant for all or part of a claim asserted in the action against the cross-claimant."

Defendants Rizzo, Levinson, Dorfman, and Weinberg have moved to dismiss the cross-claim. They contend that the unions lack standing to assert the cross-claim because, rather than asserting their own rights, the unions merely are seeking redress for harm to a third party—Boyce. They also contend that the cross-claim fails to state a claim upon which relief can be granted, and, in addition, defendant Weinberg contends that I should exercise discretion to dismiss the cross-claim as untimely filed. Because I believe that the unions lack standing, I need not address the other contentions.

The federal concept of standing focuses on whether a party has "alleged such a personal stake in the outcome of the controversy" (*Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962)) that he should be permitted to assert a claim in federal court. In part, the requirement derives from Article III, § 2 of the Constitution, which limits federal judicial power to "cases" or "controversies." As the Supreme Court explained in *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976)—

> "[W]hen a plaintiff's standing is brought into issue the relevant inquiry is whether, assuming justiciability of the claim, the plaintiff has shown an injury to himself that is likely to be redressed by a favorable decision. Absent such a showing, exercise of its power by a federal court would be gratuitous and thus inconsistent with the Art. III limitation. [Footnote omitted.]"

To satisfy the constitutional requirement, the party thus must show some personal "injury in fact, economic or otherwise" (*Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 152, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970)) that is "fairly traceable to the defendant's acts or omissions" (*Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 261, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977)).

In addition to this constitutional minimum, federal standing entails other requirements imposed by the Supreme Court in a prudential exercise of self-restraint to assure that issues are not decided prematurely or without proper focus. *See Warth v. Seldin*, 422 U.S. 490, 499–501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Flast v. Cohen*, 392 U.S. 83, 97, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). To assure that a dispute has the proper legal focus, standing thus requires analysis of the legal claim asserted to determine that "the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Data Processing, supra*, 397 U.S. at 153, 90 S.Ct. at 830; *see Warth, supra*, 422 U.S. at 500, 95 S.Ct. 2197; *Tax Analysts and Advocates v. Blumenthal*, 566 F.2d 130, 137–45 (D.C.Cir. 1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). To assure that federal judicial intervention occurs only if necessary to protect the specific interests of an aggrieved person rather than merely "to decide abstract questions of wide public significance" which might best be addressed in another forum, the prudential rules require a claimant to assert his own rights and interests rather than those of third persons. *Warth, supra*, 422 U.S. at 499–500, 95 S.Ct. at 2206; *see Singleton v. Wulff*, 428 U.S. 106, 113–14, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) (plurality opinion); *Tileston v. Ullman*, 318 U.S. 44, 63 S.Ct. 493, 87 L.Ed. 603 (1943) (per curiam); *O'Malley v. Brierley*, 477 F.2d 785, 789 (3d Cir. 1973). Since the prudential rules have been imposed as an exercise of the Supreme Court's supervisory authority over the federal judiciary (*Tax Analysts, supra*, 566 F.2d at 137 & n.37), they are subject to alteration by Congress or by the Supreme Court itself. *See, e. g., Singleton, supra*, 428 U.S. at 114–16, 96 S.Ct. 2868 (plurality opinion) (setting forth general requirements to overcome third-party standing rule); *Warth, supra*, 422 U.S. at 500–01, 95 S.Ct. 2197 (discussing Congressional abrogation of prudential rules); *Barrows v. Jackson*, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953) (reaffirm-

ing prudential rule against assertion of third party's rights but not applying that rule in "unique situation" before the Court)..

The standing objection raised by the moving defendants relates mainly to the prudential rule against assertion of third parties' rights. A review of the Supreme Court's decisions discloses, however, that that rule has not been applied in certain types of cases in which the plaintiff has been authorized to act as representative of the third party. The earliest case advancing this representational analysis was *National Motor Freight Traffic Association, Inc. v. United States*, 372 U.S. 246, 83 S.Ct. 688, 9 L.Ed.2d 709 (1963) (per curiam), which involved a challenge by associations of motor carriers to certain orders of the Interstate Commerce Commission. In its brief opinion, the Court stated:

"The appellants are associations of motor carriers, authorized under 49 U.S.C. § 5b, and perform significant functions in the administration of the Interstate Commerce Act, including the representation of member carriers in proceedings before the Commission. Since individual member carriers of appellants will be aggrieved by the Commission's order, and since appellants are proper representatives of the interests of their members, appellants have standing to challenge the validity of the Commission's order in the District Court. See Administrative Procedure Act, 5 U.S.C. § 1009(a); *FCC v. Sanders Bros. Radio Station*, 309 U.S. 470, [60 S.Ct. 693, 84 L.Ed. 869]; *NAACP v. Ala-*

*bama ex rel. Patterson*, 357 U.S. 449, 459 [78 S.Ct. 1163, 2 L.Ed.2d 1488]." 372 U.S. at 247, 83 S.Ct. at 689.

Although the statutory references indicate that the Court's holding was based, at least in part, on Congressional liberalization of prudential standing rules,[6] the *National Motor Freight* opinion has been cited repeatedly by the Court as authority for the proposition that an organization may act as representative of a third party in bringing a federal action.

The Court's first extensive discussion of the standing of an organization to sue as representative of its members was in *Warth v. Seldin, supra*. That case involved a suit by certain associations challenging allegedly exclusionary zoning ordinances in Penfield, New York. In a general discussion of the associations' standing, the Court stated the previously established rule that "an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy," and it added that in such an action the association could assert the rights of its members, "at least so long as the challenged infractions adversely affect its members' associational ties." 422 U.S. at 511, 95 S.Ct. at 2211; *accord, Allee v. Medrano*, 416 U.S. 802, 819 n.13, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974); *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 458–60, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958).[7] The Court went on, however, to state the following:

6. The cited section of the Interstate Commerce Act, § 5a, 49 U.S.C. § 5b, authorizes certain agreements among motor carriers subject to ICC approval. The Administrative Procedure Act section (now codified at 5 U.S.C. § 702) authorizes suit by persons "adversely affected or aggrieved" by actions of administrative agencies. *FCC v. Sanders Bros. Radio Station*, cited by the Court, was a case in which the Court recognized the standing of a potential competitor of a broadcast license applicant even though the competitor's alleged economic injury was not an element to be considered in deciding whether the license should be granted. The Court based its decision on the fact that § 402(b) of the Communications Act of 1934 authorized challenges to such applications "by any . . . person aggrieved or whose inter-

ests are adversely affected" by a broadcast license decision and stated that "[i]t is within the power of Congress to confer such standing to prosecute an appeal." 309 U.S. at 476–77, 60 S.Ct. at 698 (footnote omitted). *NAACP v. Alabama ex rel. Patterson*, was the only authority cited by the Court that did not involve a Congressional standing authorization.

7. The unions have not asserted that their cross-claim falls within this standing rule. As I read the cross-claim, it does not appear that the unions are asserting any rights of their own. Since Boyce is still a member of Local 1660 even though she has been discharged from public employment, her associational ties with the unions do not appear to be implicated in this suit.

"Even in the absence of injury to itself, an association may have standing solely as the representative of its members. *E. g., National Motor Freight Assn. v. United States*, 372 U.S. 246 [83 S.Ct. 688, 9 L.Ed.2d 709] (1963). The possibility of such representational standing, however, does not eliminate or attenuate the constitutional requirement of a case or controversy. *See Sierra Club v. Morton*, 405 U.S. 727 [92 S.Ct. 1361, 31 L.Ed.2d 636] (1972). The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit. *Id.*, at 734–741 [92 S.Ct. 1361]. So long as this can be established, and so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction." 422 U.S. at 511, 95 S.Ct. at 2211–2212.

█ *Warth*'s specific endorsement of "representational standing" has been repeated in cases decided subsequently by the Court. For example, in *Simon v. Eastern Kentucky Welfare Rights Organization, supra*, the Court considered the standing of an unincorporated association and several nonprofit corporations representing the interests of low-income persons in obtaining medical services. The Court concluded that none of the organizations alleged injury to themselves and that therefore "they can establish standing only as representatives of those of their members who have been injured in fact, and thus could have brought suit in their own right." 426 U.S. at 40, 96 S.Ct. at 1925. Last Term, in *Hunt v. Washington State Apple Advertising Comm.*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), the Court quoted extensively from *Warth* in recognizing the representational standing of a state agency acting on behalf of certain state fruit growers and dealers. The Court rejected a claim that as a state agency the plaintiff was not a proper party to invoke representational standing, explaining that, although the persons represented by the agency did not have the same status as members of a traditional trade association, the relationship between the agency and the fruit growers and dealers "for all practical purposes" was so similar to that in a trade association that to differentiate between them "would exalt form over substance." 432 U.S. at 344–45, 97 S.Ct. 2434.[8] The Court summarized the representational standing rules developed in its cases as follows:

"Thus we have recognized that an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit." 432 U.S. at 343, 97 S.Ct. at 2441.

---

**8.** *Hunt* makes it clear that representational standing depends on a factual analysis of the relationship between the plaintiff and the persons whose interests the plaintiff seeks to represent. It does not depend on legal formalisms, such as whether or not the representative is incorporated (*see Simon, supra* ) or the nature of the legal relation between the represented persons and the plaintiff. Each of the cross-claimants in this case is a union—a voluntary unincorporated association. Such an association has been defined as merely "a name applied to a group of individuals who have joined together for a common object and who are called, for convenience, by a common name."

1 W. Fletcher, *Cyclopedia of the Law of Private Corporations*, § 17, at 58 (rev.perm.ed.1974), adopting definition in *Herman v. United Automobile Workers*, 264 Wis. 562, 567, 59 N.W.2d 475, 477 (1953). It has been said that "an association has no legal existence as an entity separate from its members." *Calagaz v. Calhoon*, 309 F.2d 248, 251 (5th Cir. 1962). Although legal formalisms are by no means controlling, it clearly is less difficult to find that an association such as a union acts in a representative capacity than to reach such a conclusion as to a separate entity such as the state agency considered in *Hunt*.

Whether the unions have representational standing depends on application of the three-part test set forth in *Hunt*. The first question is whether the union member whose rights are sought to be protected—Boyce—has standing in her own right. The averments state that Boyce has been dismissed from her job as a result of actions of the named defendants. If Boyce is successful in this suit, she may obtain reinstatement. Boyce therefore meets the constitutional requirement of an injury in fact traceable to the defendants that is likely to be redressed by a decision favorable to plaintiff in this case. The suit is brought under, *inter alia*, 42 U.S.C. § 1983,[9] which authorizes suit for deprivation of federal rights committed under color of state law. Dismissal from employment by a state governmental unit because of the expression of one's beliefs and opinions on political or other matters is encompassed within the scope of that statute. Since the averments assert just such a claim, Boyce thus meets the prudential "zone of interests" standing test. Boyce therefore has standing to assert this claim in her own right.

The second question is whether the interests sought to be protected by the union are germane to the unions' purpose. The reason for this inquiry is obvious. Although the Supreme Court has recognized that an association may sue as representative of its members, the association's representative capacity will seldom, if ever, extend to all of its members' interests. A local PTA, for example, cannot be expected to represent its members in matters not relating to education. It is necessary, therefore, to assess the interest asserted to be sure that it is one that the claimant can properly assert as a true representative. The averments in this case state that one of the unions' functions is to represent employees of the Philadelphia School District, such as Boyce, in labor matters. Since this case involves Boyce's dismissal from her employment, the interest sought to be protected clearly is germane to the unions' function of protecting School District employees.

The final question is whether the claim asserted or the relief requested requires such individualized proof that each injured party is indispensable to proper resolution of the case. It is the failure to meet this requirement that is fatal to the unions' standing. In discussing individualized proof, the Supreme Court has concentrated mostly on the type of relief requested. In *Warth, supra,* the Court noted that those cases in which representational standing has been allowed were actions for prospective relief in which "it [could] reasonably be supposed that the remedy, if granted, [would] inure to the benefit of those members of the association actually injured." 422 U.S. at 515, 95 S.Ct. at 2213. It contrasted those cases with cases asserting claims for damages, which generally are "peculiar to the individual member concerned," requiring individualized proof of the fact and extent of injury. *Id.* at 515–16, 95 S.Ct. at 2214. In light of this distinction, it has been held that representational standing usually must be limited to claims for prospective declaratory or injunctive relief, a conclusion that precludes allowance of the unions' cross-claim insofar as it seeks back pay or other monetary relief. *See, e. g., International Woodworkers v. Georgia-Pacific Corp.,* 568 F.2d 64, 66–67 (8th Cir. 1977). The Court's language in *Warth* and *Hunt* also indicates, however, that the claim asserted may be so particularized that representational standing—even for equitable relief—may be inappropriate. I believe that this is such a case.

Although Boyce asserts that an overriding cause of her dismissal was the political patronage system, the averments in the complaint demonstrate that her case is unique and is based on more than mere patronage. She alleges that, of those school district employees laid off in the spring of 1976, she is the only one who hasn't been

---

**9.** The unions' legal theory is not explicitly set forth in the cross-claim, but, from a reading of the cross-claim in conjunction with other pleadings and documents in this case, it is fairly apparent that the cross-claim is brought under the 1871 Civil Rights Act, including § 1983.

rehired. The complaint states further that reasons for her dismissal and failure to be rehired include "slanderous remarks" made by her about the Rizzo Administration, "the political beliefs of certain members of her family, which adversely reflected on her", and "her expression of opinion and that of members of her family." It is clear, therefore, that Boyce is not just asserting a political patronage claim as one of several aggrieved employees. This point is emphasized by my holding in the companion case, Civil Action No. 77–3454, that although there is some question whether Boyce can recover on a patronage theory because it is unclear whether the controlling case in that area, *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), applies retroactively to Boyce's dismissal, Boyce's allegations relating to retaliation for expression of her beliefs are sufficient in themselves to withstand a motion to dismiss (*Boyce v. School District of Philadelphia*, 447 F.Supp. 357, 360–62 (E.D.Pa. 1978)). The claim of retaliation for expression of opinion by her and her family is peculiar to Boyce.

■ Because of the unique nature of Boyce's claim, individualized proof on that claim is necessary, and, under *Hunt*, representational standing therefore is not permitted. Of course, it is true that Boyce is already a party to this litigation so that the individualized proof will be available, but that fact does not alter the representational standing analysis. The Supreme Court has only recognized representational standing in those cases in which the representative plaintiff sought declaratory or equitable relief that would benefit a large class of persons affiliated with the representative. *See Hunt, supra* (state agency representing Washington State apple growers and dealers); *Simon, supra* (associations and corporation representing low-income persons); *Meek v. Pittenger*, 421 U.S. 349, 355–56 n.5, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975) (organizations representing Pennsylvania taxpayers); *Warth, supra*, 422 U.S. at 514–17, 95

S.Ct. 2197 (association representing residential home construction firms); *National Motor Freight, supra* (associations representing motor carriers).[10] *See also Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 263–64, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (intimating that housing developer might be allowed to represent its prospective tenants). The utility of this approach is readily apparent. It allows the common interests of a large group of persons to be asserted by a single entity closely associated with them and sharing their goals, thus reducing the complexity of the litigation. The result is the same as that using the more familiar class action device, in which a class representative is designated .to contest the action on behalf of those persons situated similarly to him. In such cases, it does not matter that one or more members of the represented class intervene personally in the lawsuit, since the representative will continue to assert the rights of the many interested persons who have not intervened in their own right, seeking relief on their behalf. In a case such as this one, however, where the subject matter of the case deals with a personal grievance and the aggrieved person (Boyce) is able to litigate on her own behalf, recognition of a representational claim would serve no purpose. Award of specific relief for Boyce's injury will not "inure to the benefit" (*Warth*, 422 U.S. at 515, 95 S.Ct. 2197) of other members of the unions. Since the other members have no personal stake in the outcome and cannot institute their own suit to redress Boyce's rights, allowance of the representational claim will provide none of the judicial economy and convenience gained from representational claims involving the rights of many persons. The beneficial effects which in other representational cases would outweigh the prudential considerations against third-party standing thus are not present here. The *Hunt* rule that representational standing is not allowed in cases requiring

10. Although recognizing the possibility of representational standing in *Simon* and *Warth*, the Supreme Court dismissed those cases for fail-

ure to comply with other standing requirements.

individualized proof therefore should be applied even though the person necessary to provide that proof is a party to this case.[11]

The result would be different if the unions' cross-claim dealt with general grievances of union members other than Boyce. A close reading of the cross-claim shows that this is not the case, however. The only way in which the cross-claim is expanded beyond Boyce's personal case is that the relief requested includes an injunction permanently restraining the defendants from dismissing union members on the basis of their political beliefs, opinions, or associations. The cross-claim contains no averments that any union members are in danger of such dismissal, however. In the absence of such allegations, a claim for so broad an injunction is not "ripe" for adjudication under prudential limitations established by the Supreme Court for decision of cases and controversies. *See, e. g., Warth, supra,* 422 U.S. at 516, 95 S.Ct. 2197; *United Public Workers v. Mitchell,* 330 U.S. 75, 86–91, 67 S.Ct. 556, 91 L.Ed. 754 (1947). Once stripped of its ramifications for union members other than Boyce, the cross-claim becomes merely a superfluous reassertion of Boyce's personal grievance for which representational standing is inappropriate.

I shall dismiss the unions' cross-claim. In doing so, I note that I read the cross-claim as an attempt to side with plaintiff in the litigation of her employment claim. It may be that the unions really desire to cross-claim against their alleged co-conspirators on the ground that if they (the unions) are found liable, the other defendants should bear full responsibility for that liability. Such a claim would present issues not discussed in this opinion.

---

11. The individualized proof inquiry of *Hunt* should not be confused with indispensable party analysis under federal procedural rules in which joinder of an indispensable party saves a case from dismissal. *See generally* Fed.R. Civ.P. 19; *Provident Tradesmens Bank & Trust Co. v. Patterson,* 390 U.S. 102, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968). Rather, the considerations underlying this inquiry are more closely related to questions of class action certification, in which the focus is on whether common questions so predominate that the case should be litigated by a class representative rather than by individual plaintiffs. *See generally* Fed.R. Civ.P. 23(a), (b). As the text notes, these considerations relate to matters of judicial economy and convenience in the context of attainment of common benefits for a discernable class by an appropriate representative who will look after the class members' specific interests.