## FEDERAL COMMUNICATIONS COMMISSION *v.* SANDERS BROTHERS RADIO STATION.

No. 499. Argued February 9, 1940.—Decided March 25, 1940.

*Mr. William J. Dempsey,* with whom *Solicitor General Biddle* and *Messrs. Richard H. Demuth, William C. Koplovitz, Robert M. Cooper,* and *Benedict P. Cottone* were on the brief, for petitioner.

*Mr. Louis G. Caldwell,* with whom *Messrs. Reed T. Rollo, Donald C. Beelar,* and *Percy H. Russell, Jr.* were on the brief, for respondent.

MR. JUSTICE ROBERTS delivered the opinion of the Court.

We took this case to resolve important issues of substance and procedure arising under the Communications Act of 1934, as amended.[1]

January 20, 1936, the Telegraph Herald, a newspaper published in Dubuque, Iowa, filed with the petitioner an application for a construction permit to erect a broadcasting station in that city. May 14, 1936, the respondent, who had for some years held a broadcasting license for, and had operated, Station WKBB at East Dubuque, Illinois, directly across the Mississippi River from Dubuque, Iowa, applied for a permit to move its transmitter and studios to the last named city and instal its station there. August 18, 1936, respondent asked leave to intervene in the Telegraph Herald proceeding, alleging in its petition, *inter alia,* that there was an insufficiency of advertising revenue to support an additional station in Dubuque and insufficient talent to furnish programs for an additional station; that adequate service was being rendered to the community by Station WKBB and there was no need for any additional radio outlet in Dubuque and that the granting of the Telegraph Herald application would not serve the public interest, convenience, and necessity. Intervention was permitted and both applications were set for consolidated hearing.

The respondent and the Telegraph Herald offered evidence in support of their respective applications. The respondent's proof showed that its station had operated

---

[1] Act of June 19, 1934, c. 652, 48 Stat. 1064; Act of June 5, 1936, c. 511, 49 Stat. 1475; Act of May 20, 1937, c. 229, 50 Stat. 189, 47 U. S. C. 151, *et seq.*

at a loss; that the area proposed to be served by the Telegraph Herald was substantially the same as that served by the respondent and that, of the advertisers relied on to support the Telegraph Herald station; more than half had used the respondent's station for advertising.

An examiner reported that the application of the Telegraph Herald should be denied and that of the respondent granted. On exceptions of the Telegraph Herald, and after oral argument, the broadcasting division of petitioner made an order granting both applications, reciting that "public interest, convenience, and necessity would be served" by such action. The division promulgated a statement of the facts and of the grounds of decision, reciting that both applicants were legally, technically, and financially qualified to undertake the proposed construction and operation; that there was need in Dubuque and the surrounding territory for the services of both stations, and that no question of electrical interference between the two stations was involved. A rehearing was denied and respondent appealed to the Court of Appeals for the District of Columbia. That court entertained the appeal and held that one of the issues which the Commission should have tried was that of alleged economic injury to the respondent's station by the establishment of an additional station and that the Commission had erred in failing to make findings on that issue. It decided that, in the absence of such findings, the Commission's action in granting the Telegraph Herald permit must be set aside as arbitrary and capricious.[2]

The petitioner's contentions are that under the Communications Act economic injury to a competitor is not a ground for refusing a broadcasting license and that, since this is so, the respondent was not a person aggrieved, or whose interests were adversely affected, by the Com-

---

[2] *Sanders Brothers Radio Station* v. *Federal Communications Commission*, 70 App. D. C. 297; 106 F. 2d 321.

mission's action, within the meaning of § 402 (b) of the Act which authorizes appeals from the Commission's orders.

The respondent asserts that the petitioner in argument below contented itself with the contention that the respondent had failed to produce evidence requiring a finding of probable economic injury to it. It is consequently insisted that the petitioner is not in a position here to defend its failure to make such findings on the ground that it is not required by the Act to consider any such issue. By its petition for rehearing in the court below, the Commission made clear its position as now advanced. The decision of the court below, and the challenge made in petition for rehearing and here by the Commission, raise a fundamental question as to the function and powers of the Commission and we think that, on the record, it is open here.

*First.* We hold that resulting economic injury to a rival station is not, in and of itself, and apart from considerations of public convenience, interest, or necessity, an element the petitioner must weigh, and as to which it must make findings, in passing on an application for a broadcasting license.

Section 307 (a) cf the Communications Act directs that "the Commission, if public convenience, interest, or necessity will be served thereby, subject to the limitations of this Act, shall grant to any applicant therefor a station license provided for by this Act." This mandate is given meaning and contour by the other provisions of the statute and the subject matter with which it deals.[3] The Act contains no express command that in passing upon an application the Commission must consider the effect of competition with an existing station. Whether the Commission should consider the subject must depend

---

[3] *Radio Commission* v. *Nelson Bros. Co.*, 289 U. S. 266, 285.

474

upon the purpose of the Act and the specific provisions intended to effectuate that purpose.

The genesis of the Communications Act and the necessity for the adoption of some such regulatory measure is a matter of history. The number of available radio frequencies is limited. The attempt by a broadcaster to use a given frequency in disregard of its prior use by others, thus creating confusion and interference, deprives the public of the full benefit of radio audition. Unless Congress had exercised its power over interstate commerce to bring about allocation of available frequencies and to regulate the employment of transmission equipment the result would have been an impairment of the effective use of these facilities by anyone. The fundamental purpose of Congress in respect of broadcasting was the allocation and regulation of the use of radio frequencies by prohibiting such use except under license.

In contradistinction to communication by telephone and telegraph, which the Communications Act recognizes as a common carrier activity and regulates accordingly in analogy to the regulation of rail and other carriers by the Interstate Commerce Commission,[4] the Act recognizes that broadcasters are not common carriers and are not to be dealt with as such.[5] Thus the Act recognizes that the field of broadcasting is one of free competition. The sections dealing with broadcasting demonstrate that Congress has not, in its regulatory scheme, abandoned the principle of free competition, as it has done in the case of railroads,[6] in respect of which regulation involves the suppression of wasteful practices due to competition, the regulation of rates and charges, and other measures

[4] See Title II, §§ 201–221, 47 U. S. C. §§ 201–221.

[5] See § 3 (h), 47 U. S. C. § 153 (h).

[6] Compare *Texas & Pacific Ry.* v. *Gulf, C. & S. F. Ry. Co.*, 270 U. S. 266, 277; *Chicago Junction Case*, 264 U. S. 258.

which are unnecessary if free competition is to be permitted.

An important element of public interst and convenience affecting the issue of a license is the ability of the licensee to render the best practicable service to the community reached by his broadcasts. That such ability may be assured the Act contemplates inquiry by the Commission, *inter alia*, into an applicant's financial qualifications to operate the proposed station.[7]

But the Act does not essay to regulate the business of the licensee. The Commission is given no supervisory control of the programs, of business management or of policy. In short, the broadcasting field is open to anyone, provided there be an available frequency over which he can broadcast without interference to others, if he shows his competency, the adequacy of his equipment, and financial ability to make good use of the assigned channel.

The policy of the Act is clear that no person is to have anything in the nature of a property right as a result of the granting of a license. Licenses are limited to a maximum of three years' duration, may be revoked, and need not be renewed. Thus the channels presently occupied remain free for a new assignment to another licensee in the interest of the listening public.

Plainly it is not the purpose of the Act to protect a licensee against competition but to protect the public. Congress intended to leave competition in the business of broadcasting where it found it, to permit a licensee who was not interfering electrically with other broadcasters to survive or succumb according to his ability to make his programs attractive to the public.

This is not to say that the question of competition between a proposed station and one operating under an

---

[7] See § 308 (b), 47 U. S. C. § 308 (b).

existing license is to be entirely disregarded by the Commission, and, indeed, the Commission's practice shows that it does not disregard that question. It may have a vital and important bearing upon the ability of the applicant adequately to serve his public; it may indicate that both stations—the existing and the proposed—will go under, with the result that a portion of the listening public will be left without adequate service; it may indicate that, by a division of the field, both stations will be compelled to render inadequate service. These matters, however, are distinct from the consideration that, if a license be granted, competition between the licensee and any other existing station may cause economic loss to the latter. If such economic loss were a valid reason for refusing a license this would mean that the Commission's function is to grant a monopoly in the field of broadcasting, a result which the Act itself expressly negatives,[8] which Congress would not have contemplated without granting the Commission powers of control over the rates, programs, and other activities of the business of broadcasting.

We conclude that economic injury to an existing station is not a separate and independent element to be taken into consideration by the Commission in determining whether it shall grant or withhold a license.

*Second.* It does not follow that, because the licensee of a station cannot resist the grant of a license to another, on the ground that the resulting competition may work economic injury to him, he has no standing to appeal from an order of the Commission granting the application.

Section 402 (b) of the Act provides for an appeal to the Court of Appeals of the District of Columbia (1) by an applicant for a license or permit, or (2) "by any other person aggrieved or whose interests are adversely affected

---

[8] See § 311, 47 U. S. C. § 311, relating to unfair competition and monopoly.

by any decision of the Commission granting or refusing any such application."

The petitioner insists that as economic injury to the respondent was not a proper issue before the Commission it is impossible that § 402 (b) was intended to give the respondent standing to appeal, since absence of right implies absence of remedy. This view would deprive subsection (2) of any substantial effect.

Congress had some purpose in enacting § 402 (b) (2). It may have been of opinion that one likely to be financially injured by the issue of a license would be the only person having a sufficient interest to bring to the attention of the appellate court errors of law in the action of the Commission in granting the license. It is within the power of Congress to confer such standing to prosecute an appeal.[9]

We hold, therefore, that the respondent had the requisite standing to appeal and to raise, in the court below, any relevant question of law in respect of the order of the Commission.

*Third.* Examination of the findings and grounds of decision set forth by the Commission discloses that the findings were sufficient to comply with the requirements of the Act in respect of the public interest, convenience, or necessity involved in the issue of the permit. In any event, if the findings were not as detailed upon this subject as might be desirable, the attack upon them is not that the public interest is not sufficiently protected but only that the financial interests of the respondent have not been considered. We find no reason for abrogating the Commission's order for lack of adequate findings.

*Fourth.* The respondent here renews a contention made in the Court of Appeals to the effect that the Com-

---

[9] Compare *Interstate Commerce Commission* v. *Oregon-Washington R. Co.*, 288 U. S. 14, 23–25.

mission used as evidence certain data and reports in its files without permitting the respondent, as intervenor before the Commission, the opportunity of inspecting them. The Commission disavows the use of such material as evidence in the cause and the Court of Appeals has found the disavowal veracious and sufficient. We are not disposed to disturb its conclusion.

The judgment of the Court of Appeals is

*Reversed.*

Mr. Justice McReynolds took no part in the decision of this case.