In re COMMONWEALTH & SOUTHERN CORP.

No. 10257.

United States Court of Appeals Third Circuit.

Argued Nov. 10, 1950.

Decided Jan. 22, 1951.

Houston H. Wasson, New York City (Logan, Marvel & Boggs, Wilmington, Del., Lovejoy, Morris, Wasson & Huppuch, New York City, Josiah Marvel, Wilmington, Del., Winslow M. Lovejoy, New York City, on the brief), for appellant J. S. Farlee & Co., Inc.

Roger S. Foster, Washington, D. C. (Harry G. Slater, Chief Counsel, Division of Public Utilities, Myer Feldman, Attorney, Securities and Exchange Commission, Washington, D. C., on the brief), for Securities and Exchange Commission.

George Roberts, New York City (Winthrop, Stimson, Putnam & Roberts, New York City, Hayden N. Smith, New York City, on the brief), for appellee Commonwealth & Southern Corp.

Lawrence E. Brown (of Brown, Scott & Dawson), Scottsboro, Ala., on the brief, for Commonwealth Warrant Holders.

Before MARIS, GOODRICH, and HASTIE, Circuit Judges.

HASTIE, Circuit Judge.

The issues involved in this appeal arose late in the course of the dissolution of the Commonwealth and Southern Corporation, hereinafter "Commonwealth", pursuant to the mandate of Section 11 of the Public Utility Holding Company Act of 1935.[1] The matter had progressed beyond judicial order "enforcing the plan" for compliance with the statutory mandate into the stage of distribution of assets, with the district court retaining supervisory jurisdiction as provided in Section 11(e) of the Act and in the court's own order of enforcement. At that stage petitioner, a brokerage firm and a stranger to the proceedings, filed in the district court the present petition to intervene seeking thereby to challenge a particular scheme of residual distribution which had been approved by the commission after the court's enforcement order. The district court denied the petition and petitioner has appealed.

More particularly, this is what the commission had done. The plan, as originally approved by the commission and the court, provided for the dissolution of Commonwealth, and the division of its assets between the holders of its preferred and common stock.[2] The design had been and is to allocate to holders of Commonwealth common stock the entire remainder of Commonwealth assets after satisfaction of the prior claim of preferred stockholders. This design has been accomplished in major part by an approved "primary disposition" of most of this remainder. The final concern of the commission, and our sole concern here, is the distribution of whatever ultimately may remain out of such Commonwealth assets as have properly been withheld until the end of the liquidation to meet claims and expenses. The approved plan of compliance embodied a proposal to distribute any ultimate remainder to Commonwealth common stockholders directly.[3] Now, while adhering to the basic design, the Commission has approved an alternative scheme of final distribution for the benefit of Commonwealth common through the device of a lump sum contribution of the ultimate remainder to the Southern Company, a wholly owned subsidiary of Commonwealth. All of the stock of Southern, except a small part still in the residue of Commonwealth assets, was part of the "primary distribution" previously authorized to Commonwealth common. Therefore, a direct distribution on the day the alternative scheme was approved would have been paid to the very persons who were the beneficiaries, albeit one stage removed, of the authorized payment to the subsidiary, Southern. Indeed, through the saving of the substantial administrative costs of distribution among many persons, the alternative scheme contemplates the distribution of a larger net sum for the benefit of Commonwealth common than would have been distributed directly under the original scheme.

Who objects to this substituted scheme of distribution? Not Commonwealth common stockholders. All participants in the liquidation proceeding were put on notice when the proposed change was submitted to the commission and again when the present petition was filed in the district court. Although a small minority of them participated below, no Commonwealth common stockholders are appellants in this proceeding. On the record, the Commonwealth

---

1. 15 U.S.C.A. § 79(k), 49 Stat. 820 (1935).

2. The holders of Commonwealth option warrants have challenged the plan for denying participation to them. We have rejected that challenge. In the Matter of Commonwealth & Southern Corp., 3 Cir. 1950, 184 F.2d 81. The option warrant holders have filed petition for certiorari in the Supreme Court.

Compare, Niagara Hudson Power Corp. v. Leventritt, 71 S.Ct. 341.

3. The approved plan provided for distributions both in cash and in kind, and permitted investment of cash in stock of subsidiaries. In either case, all of Commonwealth's remaining assets were to be paid directly to its common stockholders.

common stockholders stand satisfied with the alternative distribution after opportunity to challenge it.

It is a newcomer to this litigation, the brokerage firm of J. S. Farlee & Co., Inc., which claims standing to challenge what the commission has done and asserts that it is aggrieved and adversely affected by the proposed distribution. Petitioner's concern came about as follows:

On July 15, 1949, the district court approved the Commonwealth plan for compliance. On July 25, 1949, on the petition of Commonwealth, and after all parties to the reorganization had waived hearing, the commission approved the presently challenged alternative scheme of residual distribution. On July 20, 1949, during the ten day interval between these steps in the dissolution procedure, petitioner entered the picture by contracting with various holders of Commonwealth common stock to purchase from them so-called "stubs", in form and in substance the promise of stockholders to turn over to petitioner their pro rata shares of any remaining assets thereafter distributed to them by Commonwealth. The agreements specifically provided that petitioner would receive nothing if there were no further distribution to stockholders.[4] Petitioner paid $1,150 for stubs of 20,000 shares.[5] At the time the agreements were made petitioner had no knowledge

that Commonwealth intended to make application to alter the scheme of distribution.

On August 15, 1949, petitioner wrote to the commission protesting the newly proposed scheme of residual distribution. The commission took the position that the alternative scheme was proper and in accordance with the plan. On May 4, 1950, petitioner filed the present petition in the district court.

There is no explicit provision in the Public Utility Holding Company Act for such a proceeding as this. Section 24 of the Act empowers "Any person or party aggrieved by an order issued by the Commission" to obtain a review of that order by filing a petition in a Court of Appeals within sixty days after the entry of the order. But there is no occasion to consider that procedure in this case since the intervenor here did not move in the forum or within the time provided in Section 24. Instead, after many months of inaction, petitioner has sought redress in the district court, relying apparently upon power inherent in that court, as a court of equity which has retained supervisory jurisdiction over the consummation of an approved Section 11(e) plan, to restrain disposition of assets inconsistent with the plan. Cf. Concurring opinion, Appeal of North American Light & Power Co., 3 Cir., 1950, 180 F.2d 975, 978.

---

4. The following is a copy of one of the agreements. It is typical:

> Abraham & Co.
> 120 Broadway
> Members New York Stock Exchange
> New York July 20, 1949.
>
> J. S. Farlee & Co., Inc.,
> 37 Wall Street,
> New York 5, N. Y.
> Gentlemen:
>
> We herewith confirm having agreed today to turn over to you the proceeds of any distribution on:
>
> 10,000 Commonwealth & Southern common shares under provisions of the "Plan for Compliance with Sections 11 (b) (1) and 11(b) (2) of the Public Utility Holding Company Act of 1935, dated July 30, 1947" and Amendments dated July 6, 1948, except the distribution of 35/100 Southern Company common and 6/100 Ohio Edison common at

the rate of 6 cents per share of Commonwealth & Southern common or $600. net to us. It is understood and agreed between us that if it is determined that there will be no distribution beyond the above-mentioned 35/100 Southern Company and 6/100 Ohio Edison common, we will nevertheless receive from you the amount stated.

It is also understood and agreed that in case of any difference of opinion between us concerning this transaction, the ruling of the New York Stock Exchange or of the New York Stock Exchange Arbitration Committee shall prevail.

Kindly confirm the foregoing by attaching firm signature to the enclosed copy of this letter.

> Very truly yours,
> Abraham & Co.

5. It also sold 4000 "stubs" for $240.00.

712

■ Recognizing the existence of such power, we are not persuaded that this is an appropriate occasion for its exercise. For in our view, petitioner's claim is not such an interest as a court of equity supervising the consummation of a Section 11(e) plan should recognize or protect.

■ Petitioner's so-called "stubs" do not give it standing as one holding a security interest in Commonwealth. Indeed, the policy of the Public Utility Holding Company Act is so strong against the uncontrolled creation of interests in already overcomplex holding companies that a corporation in the position of Commonwealth could not itself issue new securities without commission approval. See 15 U.S.C.A. §§ 79f, 79g (1946), 49 Stat. 814–17 (1935). A court should not accord equivalent effect to unapproved collateral agreements between stockholders and strangers to the enterprise.

Moreover, petitioner's very bargain with stockholders excluded it from standing in their shoes or asserting any claim through them or in their right. At most, the operative agreements appear on their face to be enforceable promises of stockholders who already have received their primary distribution to surrender to petitioner what they get on final distribution, if they get anything. The agreement adverts to the possibility that there may be no further distribution to stockholders and provides that petitioner take nothing in that event. Thus, petitioner did not bargain for even so favorable a position as that of an assignee with reference to his assignor's right. It simply paid for a promise made on a condition the failure of which was contemplated as not unlikely. Now the condition has failed leaving it without recourse either through or against the stockholder. Petitioner bargained for very little and got what it bargained for.

We think this analysis requires the conclusion that petitioner is in no such jural relationship with any party or any subject matter involved in the Commonwealth case as to make its claim an interest entitled to the protection of commission or court.

■ The purpose and policy of the Public Utility Holding Company Act also suggest that petitioner's lack of relationship to the enterprise under reorganization weighs heavily against recognition of its claim. Cf. Federal Communications Comm. v. Sanders, 1940, 309 U.S. 470, 642, 60 S.Ct. 693, 84 L.Ed. 869, 1037. The Act is designed to protect the public, investors, and consumers from the economic effect of complex, unwieldly, and dishonest organization of public utilities and particularly from the effect of false, misleading and irresponsible security advertising. 15 U.S. C.A. § 79a (1946), 49 Stat. 803 (1935). It requires simplification of complex holding companies. It requires commission supervision of the planning of such simplification. It explicitly requires commission consideration of the rights of those already in the expiring enterprise.[6] It requires commission consideration of the interests of the public and the protection of investors and consumers. This is the normal area of commission concern as indicated by the statute itself. Perhaps there may arise an unusual case with particularly strong and appealing equities in which the commission or the court should protect interests outside of this area. But this is not such a case. In the entire context of the Act it is not required that the commission protect an unsolicited adventurer who, finding that the interim stages of large public utility reorganizations inevitably create possibilities of gain for those who rightly place their bets, places his by superimposing upon existing security interests in the moribund corporation new complexities in the form of novel speculative agreements which are created and have significance only because it takes time to dismantle a large corporation. Any claim of a person so situated to protection as an "investor" is a distortion of the in-

6. Section 11(e) particularly requires that the plan be fair and equitable to those "affected" by it. This could hardly be thought to include persons whose interests arise after the plan is approved.

vestment conception inconsistent with the basic purposes of the legislation, and a clog on normal and desirable administrative flexibility. Compare Davis, Standing to Challenge and to Enforce Administrative Action, 49 Col.L.Rev. 759, 791–95 (1949).

It is true that action approved by the commission has caused petitioner to lose out on its gamble. But whatever its economic loss, petitioner is not in legal contemplation aggrieved by a commission order unless the commission is under some duty to protect its interest. *Damnum absque injuria* remains a significant and valid conception in our law and in this case.

Whether one in petitioner's position could complain of bad faith on the part of the commission or any design of the commission or other parties to the reorganization to deprive it of its expectancy we need not consider. On the record, the commission, the corporation, and its stockholders must all be taken to have acted in good faith and in exercise of honest judgment in concluding that the alteration of the mechanics of final disposition was a fair procedure and in accordance with the plan. We think petitioner can be entitled to no more. Therefore, the district court was right in refusing to let petitioner intervene.

We are aware that the district court considered the merits of petitioner's claim that the substituted distribution procedure was inconsistent with the plan and that the court found no inconsistency. There is substantial basis for this conclusion but we do not predicate decision upon it. We think petitioner's interest was not such as to entitle it to a judicial review of the good faith judgment of the commission acquiesced in by the stockholders that the proposed alteration of the mechanics of the distribution of the final residue of the corporate estate was in accordance with the plan of compliance.

The judgment of the district court will be affirmed.