**MOUNT WILSON FM BROADCAST-ERS, INC., et al., Petitioners,**

v.

**FEDERAL COMMUNICATIONS COM-MISSION and United States of America, Respondents,**

**Prime Time Broadcasting Limited, et al., Intervenors.**

**Nos. 87–1289, 89–1029.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 12, 1989.

Decided Sept. 15, 1989.

Before WILLIAMS and SENTELLE, Circuit Judges, and WILL,* Senior District Judge.

Opinion for the Court filed by Senior District Judge WILL.

WILL, Senior District Judge:

On February 25, 1985, the Federal Communications Commission (the "FCC" or "Commission") allotted FM radio channel 285A to San Clemente, California. Petitioners, Mt. Wilson FM Broadcasters, Inc. and Eric Chandler Communications of San Diego, Inc., broadcast on FM radio channels adjacent to channel 285A. They contest the FCC's finding of a "reasonable assurance" that a properly spaced transmitter site would be available for operation on the new channel. Although we find that the petitioners arguably have stand-

---

* The Honorable Hubert L. Will of the United States District Court for the Northern District of Illinois, Eastern Division, is sitting by designation pursuant to 28 U.S.C. § 294(d) (1982).

ing, we approve the Commission's contention and find that the controversy is unripe for review at this time.

Establishing a radio station on a new FM channel entails two steps carried out in two separate proceedings. Objectors, like petitioners here, may and normally do participate in both steps. First, the FCC allots the channel or frequency to a particular community in a rulemaking proceeding. *See* C.F.R. § 73.202(b) (1988) (Table of Allotted FM Channels). Typically, such a proceeding begins on the petition of a party interested in setting up a new radio station. The petition must contain, among other things, a "reasonable assurance" that a transmitter site is available that meets the minimum separation requirements, which are designed to prevent interference among stations on the same or adjacent channels. 47 C.F.R. § 73.207; *see also North Texas Media, Inc. v. FCC*, 778 F.2d 28, 30 (D.C. Cir.1985); *In re Amendment of § 73.202(b) (Pinckneyville, Illinois)*, 41 Rad.Reg.2d 69, 71 (1977). The Commission will presume that a technically feasible site exists unless an interested party challenges the presumption. *In re Amendment of § 73.202(b) (San Clemente, California)*, 3 F.C.C.Rcd. 6728 (1988). Here, the first step has been completed and a channel allocated.

After it has allocated a channel, the Commission in a second proceeding considers applications for licenses on that channel. As in the earlier proceeding, an applicant must show "with reasonable assurance in good faith that [a transmitter] site will be available." *In re Louis Vander Plate*, 13 F.C.C.2d 952, 957–58 (1968); *see also In re Application of Sampson Broadcasting Co.*, 33 Rad.Reg.2d 923, 929–30 (1975). Even at this stage, the FCC does not require the applicant "to establish that it has a binding arrangement, or legal control of the land.... An oral promise by the landowner to sell or lease property is sufficient." *In re Louis Vander Plate*, 13 F.C.C.2d at 957–58. In practice it seems clear that while the FCC will find an "assurance" reasonable for licensing purposes with only a modest probability of a final site acquisition, it is satisfied with even less

for an allotment. The second step may, however, never result in a license being issued because a suitable transmitter site may never be found or a waiver of the minimum distance separation rule may never be granted by the Commission.

Here, Sunbelt Television, Inc. initiated the channel 285A allotment proceeding with a petition containing the customary assertion that "appropriate transmitter sites would be available." The two radio broadcasting companies operating stations on nearby frequencies opposed the allotment, arguing that there was no available site meeting the minimum separation requirements. Mt. Wilson is the licensee of FM station KKGO in Los Angeles, which, as it operates on one of the nearest available frequencies, is the "first adjacent" station. The minimum separation rules require a distance of at least 105 kilometers between it and the proposed channel 285A. 47 C.F.R. § 73.207(b)(1) (Table A). Audio House, Inc., the predecessor in interest to Eric Chandler and hereafter referred to as Chandler, operated FM station KCBQ, the "second adjacent" station. At the time the petition was filed, FCC regulations required a separation of at least sixty-four kilometers; as of March 1, 1984, this was increased to sixty-nine kilometers. *See In re Modification of FM Broadcast Station Rules to Increase the Availability of Commercial FM Broadcast Assignments*, 94 F.C.C.2d 152, 169–70 (1983); 47 C.F.R. § 73.207(b)(1) (Table A) (current separation requirements). It appears that the more distant the frequency, the smaller a station's geographic separation need be.

Mt. Wilson and Chandler argued that the only site area meeting the separation requirements was within the Camp Pendleton Marine Corps Base. In 1966 the FCC had refused to allot channel 285A to San Clemente because the military base was unavailable for all civilian uses, including transmitting radio signals. *In re Amendment of § 73.202 (Carrollton, Ky., et al.)*, 2 F.C.C.2d 647 (1966). The broadcasters argued that circumstances had not changed since then and submitted a supporting affidavit by Saul Levine, the president of Mt. Wil-

son. He recounted that on May 22, 1984 he had talked with a major in the Chief of Staff's Office, as well as a major who served as the head of the base's Communications and Electronics Division. Both men indicated that Camp Pendleton's policy remained unchanged and that no civilian transmitter would be allowed on its property. In addition, Levine said he had visited the site area and that it was "completely devoted to hazardous military training operations."

In response, Sunbelt offered evidence of a change in the policy relating to civilian use. Sunbelt's president reported a conversation with one Dawn Lawson, described only as being "of the Department of Natural Resources, Camp Pendleton," who told him that "certain civilian uses" were allowed, "provided such uses do not interfere with the military functions of the camp." Sunbelt also provided the FCC with a copy of a letter from Colonel A.A. Bernotas, the Assistant Chief of Staff, Facilities. Bernotas adopted the same nebulous position as Ms. Lawson:

> In response to your inquiry of 3 July 1984, the Marine Corps does in certain cases permit civilian use of military property. This is in no way an approval for your proposal to place a transmitter tower on Camp Pendleton.
>
> Your proposal would require close evaluation since military use of the land for training purposes takes precedence in all cases.

Sunbelt did not identify any alternate transmitter site area but relied solely on the availability of land at Camp Pendleton. *See* Reply Comments of Sunbelt Television, Inc., Joint Appendix ("J.A.") 72; Addendum to Reply Comments, J.A. 79.

On February 15, 1985 the Chief of the FCC's Policy and Rules Division ordered that the FM Table of Allotments be amended to include channel 285A. *In re Amendment of § 73.202(b) (San Clemente, California)*, MM Docket No. 84–442, slip op. (Feb. 25, 1985). As to the transmitter site area, the opinion recognized that the only sites which could meet the minimum spacings would have to be in Camp Pendleton,

but, apparently in reliance on the Bernotas letter, found that "the Marine Corps indicated its willingness to evaluate the proposal." *Id.* at 2. Petitioners sought reconsideration, but the Policy and Rules Chief affirmed his original decision. *In re Amendment of § 73.202(b) (San Clemente, California)*, MM Docket No. 84–442, slip op. (Aug. 13, 1986).

Petitioners then requested the FCC to review its staff's determinations; the Commission affirmed the channel allotment without addressing the siting issue, except to observe that Camp Pendleton had determined that it would *not* approve construction of a transmitter, that eleven out of twelve applicants for a license for channel 285A had requested waivers of the specific requirements, and that one applicant (the James and Claudia Harden partnership) had specified a qualifying site outside the Camp. *In re Amendment of § 73.202(b) (San Clemente, California)*, 2 F.C.C.Rcd. 2514 (1987). Mt. Wilson, with the support of Chandler, petitioned for reconsideration. It pointed out that the Harden site was in fact within Camp Pendleton, and that the Camp would not permit a transmitter there. It offered a copy of a letter from the Assistant Chief of Staff, Facilities, evidently Colonel Bernotas's successor, referring to the Harden proposal and stating that "such a tower has been determined to be incompatible with the training mission of the base and would not be approved." Thus no properly spaced site for channel 285's transmitter existed, and the FCC could grant a broadcast license only if it waived its separation requirements. The Commission nonetheless denied the petition. Although it acknowledged that the Camp Pendleton transmitter site area apparently was no longer available, it viewed the matter as of the time of the initial staff allotment decision. At that time, it said, there was a "reasonable likelihood that a site on Camp Pendleton would be made available for broadcast use." *In re Amendment of § 73.202(b) (San Clemente, California)*, 3 F.C.C.Rcd. 6728 (1988). Mt. Wilson and Chandler then filed this petition for review.

## STANDING

As a threshold matter, the FCC argues that this case is not justiciable because neither petitioner has standing to bring such an action. Standing to challenge an order of the Commission is conferred by the Federal Communications Act, 47 U.S.C. § 151 *et seq.* (1982), which allows an appeal to this court by "any ... person who is aggrieved or whose interests are adversely affected" by an order. 47 U.S.C. § 402(b)(6). This requirement is satisfied if the appellant can "specif[y] *a concrete, economic interest that has been perceptibly damaged by the Commission's [order]*." *Orange Park Florida T.V., Inc. v. FCC,* 811 F.2d 664, 673 (D.C.Cir.1987) (emphasis added).

If potential future interference were the only injury identified by Mt. Wilson and Chandler, the FCC's argument as to standing by itself would win. But the petitioners allege an economic harm that they assert flows directly from the allotment decision itself. They contend that the FCC order affects the value of their enterprise, since the existence of an allotted channel decreases the costs of establishing a competing radio station. A potential competitor no longer faces the burden of petitioning for a channel allocation, but may proceed directly to the licensing stage. Such an easing of entry barriers for competing and possibly interfering entities allegedly decreases the value of petitioners' radio stations. *Cf. FCC v. Sanders Bros. Radio Station,* 309 U.S. 470, 476, 60 S.Ct. 693, 698, 84 L.Ed. 869 (1940) (operator of a radio station had standing to challenge licensing order granting license to competitor because of economic injury from resulting competition); *Panhandle Producers & Royalty Owners Ass'n v. ERA,* 822 F.2d 1105, 1108–09 (D.C.Cir.1987) (easing of entry barriers caused sufficient economic harm to confer standing on potential competitor). If any agency's act creates "a substantial probability" of an "injury in fact," the causation requirement of Article III is satisfied. *Warth v. Seldin,* 422 U.S. 490, 504, 95 S.Ct. 2197, 2208, 45 L.Ed.2d 343 (1975); *see also Duke Power Co. v. Carolina Env. Study Group, Inc.,* 438 U.S. 59, 75 n. 20, 98 S.Ct. 2620, 2631 n. 20, 57 L.Ed.2d 595 (1978) ("substantial likelihood" enough for redressability).

While, as petitioners contend, the allotment of a channel without the issuance of a license may increase the possibility of future competition and thereby adversely affect the market value of their businesses, they offer no evidence to support that assertion or to evaluate the extent of their damage. Obviously, it is significant, if at all, only if the petitioners are contemplating some transaction such as a sale. It should have no effect on their current income or profits.

Virtually all businesses, licensed or not, to a greater or lesser degree, face the possibility of future competition, and that is generally considered highly desirable even though it may affect their market value. Petitioners cite *FCC v. Sanders Bros. Radio Station,* 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869 (1940), in which the Supreme Court held that the operator of a radio station had standing to challenge an order granting a license to a competitor on the ground of economic harm. But the allotment of a channel and the issuance of a license to a competitor to broadcast on that channel are vastly different in their threat of competition and, accordingly, their economic impact. On the record before us, whether the former creates a concrete, economic interest that has been perceptibly damaged by the Commission's order is doubtful.

## RIPENESS

Even if petitioners could establish sufficient economic harm to confer standing, the Commission's action allocating channel 285A without the issuance of a license is unripe for review. While the allotment decision may be a final order, the Commission contends that the controversy will not be ripe until it decides in a license proceeding whether to waive the minimum separation rules and grant a license for channel 285A. *See Friends of Keeseville, Inc. v. FERC,* 859 F.2d 230, 235 (D.C.Cir.1988) (a final agency action nonetheless can be un-

ripe). It notes that eight applications for channel 285A, all of which request waivers, are currently pending and unresolved.

■ There are important reasons why appellate courts should not be importuned to review administrative agency actions, which are preliminary to further agency actions which are in turn essential, before there is any substantial long-range significance or economic impact. In a now familiar passage, the Supreme Court said that in the context of reviewing agency determinations the doctrine of ripeness serves:

> to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and *its effects felt in a concrete way by the challenging parties.*

*Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967) (emphasis added). A further objective is to avoid piecemeal, duplicative, tactical and unnecessary appeals which are costly to the parties and consume limited judicial resources. *See Cobbledick v. United States,* 309 U.S. 323, 325–26, 60 S.Ct. 540, 541–42, 84 L.Ed. 783 (1940).

The ultimate test of ripeness requires the appellate court to "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories,* 387 U.S. at 149, 87 S.Ct. at 1515. This court has framed the test to be: "[I]f the interests of the court and agency in postponing review outweigh the interests of those seeking relief, settled principles of ripeness squarely call for adjudication to be postponed." *State Farm Mut. Auto. Ins. Co. v. Dole,* 802 F.2d 474, 480 (D.C.Cir. 1986).

■ The foregoing principles mandate dismissal of this appeal as premature and unripe. The petitioners ultimately seek to prevent another license being granted to a broadcaster in their geographic area. The first tactic available to them was to oppose the allocation of any new channel. If, as here, a channel is nevertheless allocated, they still can oppose before the Commission, as they are now doing, each of the applications for a license (here twelve) on that channel, preserving their objections to the allotment.

At that point, all of the issues which concern both petitioners and potential applicants will be resolved by the Commission. Thereafter, petitioners may, if the Commission's decision is adverse to what they believe are their interests, raise every issue they now raise plus any additional ones they deem relevant, and the reviewing court will be able to "see the concrete effects and implications" of its review and ruling. *American Trucking Ass'ns, Inc. v. ICC,* 747 F.2d 787, 789 (D.C.Cir.1984). If the Commission denies the pending waiver requests and denies all license applications, petitioners will have no need for an appeal and, given the Commission's broad discretionary authority, there may be no appeal at all. The present appeal simply gives petitioners two possible bites at the same apple.

It may be that, if the Commission declines to waive the minimum distance separation rule or for other reasons declines to grant any current applicant a license, the petitioners may have no basis for an appeal and may face the possibility of other applicants seeking licenses on the allocated channel at later dates. In any future license application proceeding, of course, petitioners may again object before the Commission on all the grounds now available and any others relevant to the new applicants and, if any license is granted, appeal the Commission ruling.

The current appeal simply delays Commission action on the ultimate question in the proceedings, the approval or disapproval of the pending applications for a license. Moreover, it seems obvious that a reviewing court will be in a better position to evaluate the propriety of any Commission action with the totality of that action before it than we are at the present time with only the first-step allotment decision before us.

Unless the "hardship to the parties of withholding court consideration" outweighs the other factors, we should dismiss this appeal. *Abbott Laboratories*, 387 U.S. at 149, 87 S.Ct. at 1515. As discussed with reference to "Standing," the only hardship which petitioners assert is that the allotment of a channel even without the issuance of a license increases the possibility of future competition and thereby affects adversely the value of their businesses, but they have offered no evidence to support that assertion.

So far as we can determine, no decision has previously held that allotment of a channel alone results in sufficient economic injury to existing license holders to make an appeal ripe. No prior opinion has discussed the subject of whether an allotment of a channel was final action ripe for review, but there are two cases in which the court appears to have assumed ripeness. *See Springfield Television of Utah, Inc. v. FCC*, 710 F.2d 620 (10th Cir.1983); *Van Curler Broadcasting Corp. v. United States*, 236 F.2d 727 (D.C.Cir.1956). Given the substantial number of channel allotments made through the years, it is surprising, if such allotments are freely appealable, that there have been so few appeals therefrom. Apparently, most objectors have been content to wait until a license to broadcast on the allotted channel has been granted.

This is certainly not the case in which to hold FCC channel allotment decisions to be ripe for appeal. In addition to the usual obstacles to the issuance of a license, there is here an additional one, the necessity to secure a waiver of the minimum distance separation rule which may prove to be insurmountable. If it becomes the law of this circuit that every allocation of a channel is ripe for review, every objector will have two opportunities to prevent or at least delay the issuance of a license. The court will, assuming that the deference to agency decisions reflected in this and other

courts' opinions continues, be hearing and deciding two appeals in cases where one appeal, or none, would protect everyone's interests and conserve judicial resources.

All the institutional interests recognized in the decisions of the Supreme Court and this and other courts militate against immediate review here. The agency decision is only the first step in the two-step licensing process. This or any appeal from a channel allotment decision may be made unnecessary by future agency action. Every issue raised by petitioners now can be raised, together with all relevant Step 2 issues, in a single appeal after the Commission has ruled on the pending license applications. Entertaining this appeal gives petitioners two opportunities to prevent or at least delay the issuance of a license. It is expensive to all involved and unnecessarily consumes limited judicial resources.

CONCLUSION

So far as the interests of the petitioners are concerned, other than losing the tactical advantages of delay and of having two bites at the same apple, the economic detriment which they would allegedly suffer if we dismiss for lack of ripeness is, at best, uncertain and unclear. Given the deference to agency discretion on channel allotments reflected in this and other courts' opinions, the probabilities are that appeals from allotments of channels, if allowed, will be of little help to existing licensees seeking to prevent the issuance of new licenses to potential competitors.

For all of the foregoing reasons, we dismiss the appeal as not ripe for review at this time.