**NEW WORLD RADIO, INC., Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee.**

**Birach Broadcasting Corporation,**
**Intervenor.**

No. 01–1110.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 15, 2002.

Decided July 2, 2002.

Lawrence Roberts argued the cause for the appellant. Jared S. Sher was on brief.

Thomas E. Chandler, Counsel, Federal Communications Commission, argued the cause for the appellee. Jane E. Mago, General Counsel, Federal Communications Commission, and Daniel M. Armstrong, Associate General Counsel, Federal Communications Commission, was on brief.

Stephen Diaz Gavin was on brief for the intervenor.

Before: HENDERSON, RANDOLPH and ROGERS, Circuit Judges.

Opinion for the court filed by Circuit Judge KAREN LeCRAFT HENDERSON. Dissenting opinion filed by Circuit Judge RANDOLPH.

KAREN LeCRAFT HENDERSON, Circuit Judge:

New World Radio, Inc. (New World), licensee of AM radio station WUST, located in Washington, D.C., appeals an order of the Federal Communications Commission (Commission or FCC) granting the application of Birach Broadcasting Corporation (Birach) to renew its license for WDMV(AM) located in Pocomoke City, Maryland. *In re Application of Birach Broadcasting Corporation for Renewal of License of Station WDMV(AM), Pocomoke City, Maryland,* 16 FCC Rcd 5015, 2001 WL 792835 (2001) (Renewal Application). New World contends the FCC erred in approving the Renewal Application because Birach failed to satisfy the "public interest, convenience, and necessity" standard of 47 U.S.C. § 309(k)(1) by failing to broadcast for thirty-two months. Because we conclude that New World lacks standing, we dismiss its appeal.

I.

Birach acquired the license for WDMV from Five Star Broadcasting, Inc. (Five Star) on January 15, 1993. Earlier, on May 8, 1992, Birach had applied to the Commission for both a construction permit to change WDMV's community of license from Pocomoke City to Brinklow, Maryland (Brinklow Application)[1] and for assignment of the WDMV broadcast license from Five Star to Birach (Assignment Application). The Assignment Application advised the Commission that Birach's obligations under the purchase agreement were contingent on the Commission's approval of the Birach Application. *See* Assignment Application, Exh. I–5. On November 25, 1992 the FCC granted both the

---

1. Birach sought to move the station to Brinklow because Pocomoke City already had two local stations, WDMV was losing money because of the competition, WDMV was likely to go off the air if it was not sold and Brinklow did not have a local station. FCC Br. 4 (citing Birach's Br. in Support of Grant of Brinklow Application at 3–5).

Assignment Application and the Brinklow Application. On January 15, 1993, the day Birach acquired WDMV, Birach also notified the FCC that it and Five Star had completed the assignment and that Five Star had taken WDMV off the air as of January 14, 1993. *See* January 15, 1993 Letter from Lauren Colby, counsel for Birach, to FCC. Birch did not purchase Five Star's Pocomoke City facilities (for WDMV) at that time because it planned on resuming operations, after construction, at new facilities in Brinklow. *Id.*

On May 6, 1994 Birach applied to the FCC to extend the Brinklow construction permit beyond the May 25 expiration date, stating that it was unable to obtain the transmitter site specified in the Brinklow Application. New World filed an informal objection to the extension request, alleging that Birach had engaged in misrepresentations and/or lacked candor in connection with its certification of site availability included in the Brinklow Application. While Birach attempted to secure an alternate transmitter site in Brinklow, WDMV remained off the air pursuant to successive FCC special temporary authorizations. *See* August 1, 1994 Letter from James R. Burtle to Birach (three-month authorization to remain silent); November 9, 1994 Letter from James R. Burtle to Birach (same); February 13, 1995 Letter from James R. Burtle to Birach (same); May 19, 1995 Letter from James R. Burtle to Birach (same); September 11, 1995 Letter from James R. Burtle to Birach (same).

The WDMV license that Birach acquired from Five Star was scheduled to expire on October 1, 1995. Consistent with the FCC rule requiring a renewal applicant to file four months before the expiration date, *see* 47 C.F.R. 73.3539, Birach filed an application for renewal of broadcast station WDMV, Pocomoke City, Maryland dated May 30, 1995 (Renewal Application).[2] On

September 18, 1995 New World filed an informal objection, claiming, *inter alia,* that Birach had not operated the radio station during the approximately 32 months that it held the WDMV license and had no firm plans to do so. On October 2, 1995 Birach filed an opposition, arguing that New World's informal objection did not constitute a petition to deny and that, in any event, New World lacked standing to file a petition to deny because it could not show that it would be injured by granting the Renewal Application. In its Reply, New World acknowledged that "it lacks the required standing to maintain a petition to deny," which, it explained, was the reason it "filed its pleading as an Informal Objection, not a petition to deny." October 11, 1995 Reply [to Birach's Opposition to Informal Objection] at 3 ¶ 5.

On July 15 1996, without having resumed broadcasting from WDMV, Birach again applied to change the community of license and relocate WDMV's transmission facilities, this time from Pocomoke City to Damascus, Maryland (Damascus Application). The Damascus Application was prompted by Birach's continuing inability to secure the site specified in the Brinklow Application. Opposing Birach at every step, New World filed a petition to dismiss or deny the Damascus Application.

The Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56 (1996) (Telecom Act) became effective on February 8, 1996. Section 312(g) provides that "[i]f a broadcasting station fails to transmit broadcast signals for any consecutive 12–month period, then the station license granted for the operation of that broadcast station expires at the end of that period, notwithstanding any provision, term, or condition of the license to the contrary." 47 U.S.C. 312(g). Any station silent as of the date of enactment had one year from the effective date of the Telecom Act—that

---

**2.** The FCC date stamp has the date as June 8, 1995.

is, until February 9, 1997—to begin broadcasting before the license automatically expired. In order to satisfy the new statutory directive, Birach purchased Five Star's Pocomoke City transmission facilities (which, as noted earlier, it had not done at the time it acquired WDMV from Five Star) and resumed operations at the Pocomoke City, Maryland site on November 11, 1996.

In light of Birach's Damascus Application, on January 14, 1997 the Audio Services Division of the FCC's Mass Media Bureau dismissed as moot Birach's Brinklow extension request and canceled its Brinklow construction permit. *January 14, 1997 Letter Decision from Linda Blair, Chief, Audio Services Division, Mass Media Bureau.*[3] In addition, the letter decision granted Birach's Renewal Application, stating that "because New World's allegations in its Informal Objection ... relate only to the station's silent status, ... we grant the pending license renewal application in light of WDMV(AM)'s resumption of broadcast operations." *Id.*[4]

On February 18, 1997, New World petitioned for reconsideration of the January

---

**3.** On January 4, 2001 the Mass Media Bureau dismissed the Damascus Application as not "technically grantable" because of the unacceptable overlap of signal strength contours with another station (WWCS(AM)) Birach partly owned in Canonsburg, Pennsylvania in violation of 47 C.F.R. § 73.37(a). Section 73.37(a) provides that "no application will be accepted for a change of the facilities of an existing station if the proposed change would involve ... overlap [of signal strength contours]" with another station as therein described. 47 C.F.R. § 73.37(a) (2002). In 1997 Birach had applied for and been granted a construction permit to reduce WWCS's daytime power and to change its daytime directional antenna parameters; these changes, if implemented, would have cured the unacceptable overlap. *See* BP–19961015AB. Birach never filed a license modification application to implement the changes, however, and its construction permit expired on December 21, 2000. *January 4, 1997 Letter Decision from Linda Blair, Chief, Audio Services Division, Mass Media Bureau* 1 n.2.

On January 9, 2001 Birach filed a new WWCS modification application to eliminate unacceptable overlap with the facilities proposed in the Damascus Application, apparently curing the defect that led to the dismissal of the Damascus Application. *See July 18, 2001 Letter Decision* at 2. Subsequently, the Mass Media Bureau granted Birach's petition for reconsideration and reinstated the Damascus Application based on Birach's amendment that made the Damascus Application and a new WWCS Application contingent applications pursuant to 47 C.F.R. § 73.3517(c) (allowing AM licensee to file contingent modification applications if granting contingent applications "will reduce interference to one or more AM stations or will otherwise increase the area of interference-free service"). New World then petitioned for reconsideration of the Mass Media Bureau's reinstatement of the Damascus Application, asserting that it improperly relied on the presumed validity of Birach's new WWCS Application, which New World claims was defective because it attempted to revive a construction permit automatically forfeited under the Commission's regulations. *See* August 23, 2001 New World Petition for Reconsideration of Reinstatement of Damascus Application at 4 ¶ 6 & n.5 (citing 47 C.F.R. § 73.3598(e)). New World also claimed that reinstatement was premature because "the Division also needs to address a number of other issues related to the [Damascus] Application," (e.g., New World's petition to dismiss or deny). *Id.* at 4–5 ¶ 7. A separate Audio Services Division letter ruling related to a modification application for Station WWTL(AM) filed by Birach's sister company, Elijah Broadcasting Corporation, also addressed some Damascus Application issues. *See July 18, 2001 Letter Ruling from Peter H. Doyle, Chief, Audio Services Division, to Elijah Broadcasting, et al.* That letter ruling is subject to a petition for reconsideration filed by New World on August 22, 2001. As of December 17, 2001 reinstatement of the Damascus Application remained pending, apparently awaiting resolution of the issues raised in New World's petition for reconsideration.

**4.** The letter decision also noted the Commission's policy of assistance to those stations

14, 1997 letter decision granting Birach's Renewal Application, reasserting the arguments made in its informal objection. The Audio Services Division, by letter, denied New World's petition for reconsideration and request for a hearing on November 20, 1997. *November 20, 1997 Letter Decision from Linda Blair, Chief, Audio Services Division, Mass Media Bureau.* New World then petitioned for review by the Commission on November 22, 1997. Birach opposed New World's petition. On February 28, 2001 the FCC denied New World's petition. See *In re Application of Birach Broadcasting Corporation for Renewal of License of Station WDMV(AM), Pocomoke City, Maryland,* 16 FCC Rcd 5015, 2001 WL 792835 (2001) (*Order*). The FCC concluded that New World's charge that Birach had made misrepresentations in connection with its filing of the Assignment and Brinklow Applications, which charge was first raised by New World eighteen months after both applications had become final, was untimely. *Id.* at ¶ 8. The FCC further concluded that New World's argument was based on the erroneous view that Birach was required to make efforts to resume broadcasting at Pocomoke City while at the same time seeking to relocate to Brinklow and then to Damascus. *Id.* Regarding any subsequent Birach misrepresentation involving Birach's operation of the station at Pocomoke City, the FCC again found no merit in New World's allegations. *Id.* In light of its longstanding policy to encourage a silent station to resume operations, the FCC affirmed the grant of Birach's Renewal Application. *Id.* at ¶ 11. In so concluding, it also noted that Birach had never been warned that keeping the station silent could jeopardize any renewal application. *Id.*

New World filed a timely notice of appeal on March 7, 2001. Birach subsequently intervened in support of the Commission. New World contends the FCC decision to grant the Renewal Application was arbitrary and capricious because Birach failed to broadcast any programming for more than thirty-one months. For the same reason, New World contends the FCC's order contravenes the public interest. Finally, New World argues that the FCC's failure to examine adequately whether Birach made misrepresentations coincident with its Assignment and Brinklow Applications left unresolved questions of fact about Birach's qualifications to remain a licensee. The FCC first challenges New World's standing to seek review of Birach's Renewal Application. Because we agree that New World lacks standing, we do not reach its arguments on the merits.

## II.

▮ The FCC challenges New World's standing, asserting New World is not injured by the grant of Birach's Renewal Application for the Pocomoke City license. Section 402(b) of the Federal Communications Act, 47 U.S.C. §§ 151 *et seq.* (1982) (Act), provides that "any ... person who is aggrieved or whose interests are adversely affected by any order of the Commission granting or denying any application" may seek judicial review thereof. 47 U.S.C. § 402(b)(6). A party is "aggrieved" under the statute if it satisfies both the constitutional and prudential requirements of standing. *See Orange Park Florida T.V., Inc. v. FCC,* 811 F.2d 664, 670 (D.C.Cir.1987); *see also City of Orrville v. FERC,* 147 F.3d 979, 985 (D.C.Cir. 1998) (citing *Louisiana Energy & Power Auth. v. FERC,* 141 F.3d 364, 366

facing the statutory deadline. *See January 14, 1997 Letter Decision from Linda Blair, Chief,*

*Audio Services Division, Mass Media Bureau* at 3–4.

(D.C.Cir.1998) (interpreting "aggrieved" party language in Federal Power Act, 16 U.S.C. § 825)).[5]

■ To establish Article III standing, a party must allege (1) an injury-in-fact that is (2) "fairly traceable" to the defendant's conduct and (3) likely to be redressed by a favorable judicial decision. *Jersey Shore Broadcasting Corp. v. FCC*, 37 F.3d 1531, 1535 (D.C.Cir.1994) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992)). To establish "injury-in-fact," the plaintiff must show "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *SunCom Mobile & Data Inc. v. FCC*, 87 F.3d 1386, 1388 (D.C.Cir.1996) (citations omitted). The burden is on the party seeking judicial review "clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's powers." *SunCom Mobile & Data Inc.*, 87 F.3d at 1388 (quoting *Warth v. Seldin*, 422 U.S. 490, 518, 95 S.Ct. 2197, 2215, 45 L.Ed.2d 343 (1975)). Moreover, "when the [party] is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Lujan*, 504 U.S. at 562, 112 S.Ct. at 2137 (citations omitted).

■ New World claims to be "aggrieved" by the FCC's grant of Birach's Renewal Application for Pocomoke City because renewal allows Birach to keep its license, moving one step closer to competing with, and therefore economically injuring, WUST, New World's Washington,

D.C. station. New World's claim is not without support; the United States Supreme Court, in the *Camp* triad, upheld "competitor standing" even though the economic injury was latent. *See Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 152, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970) (sellers of data processing services had standing to test ruling allowing national banks to sell data processing services because competition "might entail some future loss of profits" in that respondent bank was already preparing to perform such services for two of plaintiffs' clients); *Arnold Tours, Inc. v. Camp*, 400 U.S. 45, 45–46, 91 S.Ct. 158, 159, 27 L.Ed.2d 179 (1970) (travel agents had "competitor standing" to challenge ruling allowing national banks to provide travel services); *Investment Co. Inst. v. Camp*, 401 U.S. 617, 620–21, 91 S.Ct. 1091, 1093–94, 28 L.Ed.2d 367 (1971) (investment companies had "competitor standing" to test regulatory ruling authorizing national banks to operate collective investment funds). Moreover, the Supreme Court held long ago that a competing broadcast station has "aggrieved" party standing under section 402(b) of the Act to challenge the grant of a license to another "on the ground that the resulting competition may work economic injury to him." *FCC v. Sanders Brothers Radio Station*, 309 U.S. 470, 477, 60 S.Ct. 693, 698, 84 L.Ed. 1037 (1940). Nonetheless, the *Camp* cases and *Sanders Brothers* are premised on the petitioner's status as a *direct* and *current* competitor whose bottom line may be adversely affected by the challenged government action.

In *Sanders Brothers*, the Court reviewed the FCC's decision to grant, in a

---

**5.** Despite the FCC's claim to the contrary, New World's acknowledgment at the agency level that it lacked "the required standing to maintain a petition to deny" Birach's Renewal Application does not decide New World's

Article III standing. Nor is New World's participation in the agency proceedings sufficient by itself to sustain Article III standing. *See Fund Democracy v. SEC*, 278 F.3d 21, 27 (D.C.Cir.2002).

consolidated hearing, two applicants (Sanders Brothers and Telegraph Herald) separate licenses to broadcast from the same city, Dubuque, Iowa. Sanders Brothers sought to relocate its transmitter and studios to Dubuque, Iowa after having for some years held a broadcast license for a station in East Dubuque, Illinois, located across the Mississippi River from Dubuque, Iowa. The Telegraph Herald, a newspaper published in Dubuque, Iowa, was applying for a construction permit to erect a broadcasting station in that city. While it found that economic injury to an existing station was not "a separate and independent element" that the Commission was required to consider in determining whether to grant a license, the Court nonetheless concluded that Sanders Brothers, as an existing station "likely to be financially injured by issuance of the license," had standing to challenge the FCC's finding that the "public interest, convenience, and necessity" would be served by granting the Telegraph Herald application. *Sanders Brothers*, 309 U.S. at 476–77, 60 S.Ct. at 698. In particular, Sanders Brothers alleged that there existed insufficient advertising revenue, talent and need for an additional station in Dubuque. The *Sanders Brothers* Court found standing in the circumstance of two stations competing for the right to broadcast in one city. In contrast, New World does not, and cannot, allege that granting Birach's Renewal Application for *Pocomoke City* will, standing

alone, "financially injure" New World's position in the *Washington, D.C.* marketplace. The FCC's decision to grant Birach's Renewal Application merely allows Birach to retain its Pocomoke City license. Instead, New World's "competitive injury" will occur, if at all, only if Birach subsequently seeks *and* secures the relocation of its Pocomoke City broadcast license to the Washington, D.C. programming area.

In *Mount Wilson FM Broadcasters, Inc. v. FCC*, 884 F.2d 1462, 1465 (D.C.Cir. 1989), Mount Wilson, an FM station licensee, challenged the FCC's decision to allot a new FM channel on a nearby frequency, claiming that the mere allotment made the possibility of future competition more likely and thereby adversely affected the current market value of its station. *Id.* at 1463. In establishing a new FM radio station, the FCC first allots the channel or frequency to a particular community and then considers applications for a license on that channel. *Id.* at 1465–67. In *Mount Wilson*, we found "doubtful" whether the mere allotment, without the issuance of a license, could damage Mount Wilson's "concrete, economic interest" sufficiently to confer standing. *Id.* at 1465.[6] Similarly here, granting Birach's Renewal Application by itself does not adequately harm New World to establish standing. In its Reply Brief, New World attempts to distinguish *Mount Wilson* by attaching great significance to *Mount Wilson's* "two bites at the same apple" language,[7] pointing out

---

**6.** The court ultimately dismissed Mount Wilson's appeal as unripe. *See Mount Wilson*, 884 F.2d at 1467.

**7.** In its ripeness discussion, the court noted that no prior case had held that "allotment of a channel alone results in sufficient economic injury to existing license holders to make an appeal ripe." *Mount Wilson*, 884 F.2d at 1467. The court found that "[a]ll institutional interests recognized in the decisions of this and other courts militate against immediate

review here" because "[e]very issue raised by petitioners now can be raised, together with all relevant Step 2 issues, in a single appeal after the Commission has ruled on the pending license applications." *Id.* While the "two bites at the same apple" ripeness issue may not be present here, the court's observation that "[t]his or any appeal from a channel allotment decision may be made unnecessary by future agency action" fits here as well because Birach may never succeed in relocating WDMV to the Washington, D.C. area.

that New World, unlike Mount Wilson, will not get two bites because it cannot raise "programming issues" in any subsequent Damascus Application/license transfer proceeding.[8] This distinction, if accurate, nonetheless does not give New World Article III standing. The "injury-in-fact" requirement "serves to distinguish a person with a direct stake in the outcome of a litigation—even though small—from a person with a mere interest in the problem." *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 690 n. 14, 93 S.Ct. 2405, 2417 n. 14, 37 L.Ed.2d 254 (1973). New World's interest in raising "programming issues" does not give it a direct enough stake in the outcome of Birach's Renewal Application to establish its standing here.

Pointing to Birach's past attempts to relocate WDMV to the Washington D.C. area, New World asserts that the FCC's decision "is tantamount to renewal of license for a radio station competing in the D.C. market." While there is support in our court's caselaw for the assertion that a party suffers cognizable injury under Article III when an agency "lift[s] regulatory restrictions on their competitors or otherwise allow[s] increased competition," *Louisiana Energy and Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C.Cir.1998) (citations omitted), this description does not fit the FCC's decision here. We read this holding to apply the "competitor standing" doctrine to an agency action that itself imposes a competitive injury, i.e., that provides benefits to an existing competitor or expands the number of entrants in the petitioner's market, not an agency action that is, at most, the first step in the direction of future competition. The difference is critical because New World *will* have an opportunity to challenge any FCC decision

that directly affects it as a competitor. *See, e.g.,* February 18, 1997 New World Petition to Dismiss and Deny Damascus Application. While the court is aware of Birach's apparent desire to compete in the Washington, D.C. market, New World's "chain of events" injury is too remote to confer standing. We cannot say, as we did in *Orange Park*, that New World has specified a "concrete, economic interest that *has been perceptibly damaged* by the Commission's award." *Orange Park*, 811 F.2d at 673 (emphasis added); *see also Associated Gas Distribs. v. FERC*, 899 F.2d 1250, 1259 (D.C.Cir.1990) (competitor had standing because "the challenged action authorized allegedly illegal transactions that have the *clear* and *immediate* potential to compete with petitioners' own sales" (emphasis added)); *National Treasury Employees Union v. United States*, 101 F.3d 1423, 1427 (D.C.Cir.1996) (no standing based on injury not "certainly impending"); *Northwest Airlines, Inc. v. FAA*, 795 F.2d 195, 201 (D.C.Cir.1986) (that party can "imagine circumstances in which it could be affected by the agency's action" insufficient for standing). In addition, New World's "chain of events" argument depends on the independent actions of third parties, distinguishing its case from the "garden variety competitor standing cases" which require a court to simply acknowledge a chain of causation "firmly rooted in the basic law of economics." *United Transp. Union v. ICC*, 891 F.2d 908, 913 (D.C.Cir.1989). Moreover, Birach has now purchased Five Star's Pocomoke City facilities in order to broadcast from that location. Finally, New World's "tantamount" contention assumes that Birach, which has failed in past efforts to relocate the license, will now persuade the FCC to reverse field.

---

**8.** New World cites no FCC regulation that would prohibit its raising Birach's failure to broadcast in a subsequent license transfer proceeding.

For the foregoing reasons, New World's appeal is

*Dismissed.*

RANDOLPH, Circuit Judge, dissenting:

Because the FCC has not yet granted the latest application by Birach Broadcasting Corporation (the intervenor in this case) to relocate its station into the Washington, D.C. radio market, the majority holds that New World Radio (the petitioner) does not have standing to challenge the FCC's *renewal* of the very broadcast license Birach seeks to relocate. Economic competitors, the majority holds, have only suffered a constitutional injury-in-fact where the petitioner is "a *direct* and *current* competitor whose bottom line may be adversely affected by the challenged government action." Maj. op. at 170. The license renewal "standing alone" is not enough. Maj. op. at 171.

I respectfully disagree. A party need not wait until after an allegedly illegal agency action causes injury to bring suit. The test for constitutional standing is less severe: a plaintiff's injury needs to be "actual or imminent, not conjectural or hypothetical." *Bennett v. Spear,* 520 U.S. 154, 167, 117 S.Ct. 1154, 1163, 137 L.Ed.2d 281 (1997). For almost ten years—its entire term of ownership—Birach has sought to move WDMV into the D.C. broadcast market. The FCC approved the company's first application to move, and Birach is currently attempting to resolve the FCC's technical objections to its second request. WDMV did not broadcast for almost four years, further proof that Birach sought the WDMV license so it could make money in the Washington, D.C. market, rather than in the unprofitable Pocomoke City, Maryland, market. Any competitive injury is surely "imminent."

I would affirm the FCC. In renewing the license for WDMV, the FCC had to decide whether the station had served "the public interest, convenience, and necessity." 47 U.S.C. § 309(k). We give "substantial judicial deference" to the FCC's judgment in this regard. *FCC v. WNCN Listeners Guild,* 450 U.S. 582, 596, 101 S.Ct. 1266, 1275, 67 L.Ed.2d 521 (1981). On the "unique facts of this case," including the FCC's repeated assurances that the station could remain silent as it sought to relocate, the FCC renewed WDMV's license despite its failure to broadcast for several years. *In re Birach Broad. Corp.,* No. BR–950608YB, at 6 (Feb. 28, 2001). New World Radio's arguments have not convinced me this action was beyond the FCC's power, so I would affirm the agency's decision on the merits.